PAULINE A. GAGE, administratrix,[1] *vs.* CITY OF WESTFIELD
(and three companion cases[2]).

No. 88-P-51.

Hampden.    October 19, 1988. — December 23, 1988.

Present: PERRETTA, KAPLAN, & FINE, JJ.

*Negligence*, Municipality, Duty to warn, One owning or controlling real
estate, Railroad, Trespasser. *Municipal Corporations*, Liability for tort.
*Massachusetts Tort Claims Act. Governmental Immunity. Wilful, Wan-*
*ton, or Reckless Conduct. Railroad. Agency*, Admission by agent, Scope
of authority or employment. *Conscious Pain and Suffering.*

In actions for wrongful death and conscious pain and suffering brought by the
administrators of the estates of a fifteen year old girl and an eighteen
year old boy who were struck and killed by a freight train, wherein it
was alleged that a municipality failed, as owner of a playground and
property adjacent to the tracks on which the accident occurred, to main-
tain its property in a reasonably safe condition and warn of known
dangers, summary judgment was properly entered for the municipal
defendant by virtue of the discretionary function and public duty excep-
tions to liability under the Massachusetts Tort Claims Act, G. L. c. 258.
[683-688]

In actions for wrongful death and conscious pain and suffering brought by
the administrators of the estates of a fifteen year old girl and an eighteen
year old boy, who were struck and killed, while standing on a railroad
track, by a freight train operated by the Consolidated Rail Corporation
(the railroad), wherein it was alleged that the railroad's passive acquies-
cence in the public's use of the tracks as a "shortcut" caused the youths
to be "lawful visitors," not trespassers, and that the railroad was liable,
therefore, for ordinary negligence, summary judgment was properly
entered for the defendant railroad on the plaintiffs' claim for ordinary

---

[1] Of the estate of Peter Gage.

[2] The companion cases were brought by Gage (as administratrix) against
Consolidated Rail Corporation and George Munger, by Joseph A.
Lajeunesse and Edna M. Lajeunesse (administrators of the estate of Theresa
Marie Lajeunesse) against the city, and by the Lajeunesses (as adminis-
trators) against the railroad and Munger.

negligence by virtue of the youths having been present on the railroad track in violation of G. L. c. 160, § 218, thus invoking the railroad's exemption from liability under G. L. c. 229, § 2, which provides that "a person operating a railroad shall not be liable for negligence in causing the death of a person while walking or being upon such railroad contrary to law." [689-690]

In actions for wrongful death and conscious pain and suffering brought by the administrators of the estates of a fifteen year old girl and an eighteen year old boy, who were struck and killed by a freight train operated by the Consolidated Rail Corporation (the railroad), wherein it was alleged that the railroad was liable for punitive damages under G. L. c. 229, § 2, for wilful, wanton or reckless conduct, it was error to allow the railroad's motion for summary judgment, where the plaintiffs presented an issue for trial concerning the railroad's possible recklessness (i.e., persistence by the railroad in highly dangerous conduct in the face of a known risk). [691-694]

In actions for wrongful death and conscious pain and suffering brought by the administrators of the estates of a fifteen year old girl and an eighteen year old boy, who were struck and killed by a freight train operated by the Consolidated Rail Corporation (the railroad), summary judgment was properly entered for the defendant railroad on the plaintiffs' claim for damages for conscious pain and suffering, where on the materials presented, the youths' only conscious suffering was their pre-impact fright. [694-696]

CIVIL ACTIONS commenced in the Superior Court Department, one on December 10, 1981; one on January 27, 1983; and two on August 23, 1984.

After consolidation for trial the cases were heard by *John F. Moriarty*, J., on motions for summary judgment.

*Evan T. Lawson* for Joseph A. Lajeunesse & another.

*Paul B. Kleinman* for Pauline A. Gage.

*Mark E. Draper* for the city of Westfield.

*Leonard F. Zandrow* (*Robert L. Farrell & Richard L. Neumeier* with him) for Consolidated Rail Corporation & another.

FINE, J. On August 25, 1981, Theresa M. Lajeunesse, almost sixteen, and Peter Gage, eighteen, were struck and killed by a Consolidated Rail Corporation (Conrail) freight train. A diagram indicating the area within the city of Westfield (Westfield) where the accident happened appears at the end of this opinion.

Actions for wrongful death and conscious pain and suffering were brought by the administrators of the decedents' estates against Westfield, Conrail, and George Munger,[3] the engineer of the Conrail train that struck the youths.[4] All of the actions were consolidated for discovery and trial. The defendants filed motions for summary judgment as to all the claims. From the allowance of those motions, both plaintiffs appeal.

1. *The Cases Against the City of Westfield Under G. L. c. 258, § 1, the Massachusetts Tort Claims Act.*

The uncontroverted facts before the motion judge relevant to the cases against Westfield were the following. On the afternoon of the day of the accident, the two decedents were among a group of teenagers drinking at the Whitney Playground, a city-owned facility that was a popular location for teenagers to congregate. The playground is located along the south side of the Westfield River. On its south, the playground is bounded by a city-owned dike; on its west by other city property; and on its east by property owned by Westfield and used by its gas and electric department. Public ways were located at both the easterly and westerly ends of the playground. No fences or barriers separated the playground from the other city property or separated the city property being used by the gas and electric department from Conrail's property just to its east.

Approximately 400 feet east of the playground, a relatively unused spur track owned by Conrail runs from Conrail's property on the south side of the river across a trestle bridge to other railroad property on the river's northerly bank where two actively-used railroad tracks run along the river in an east-west direction. The spur tracks intersect with the east-west tracks on an area of railroad property known, because of its shape, as

---

[3] The parties make no distinction in their briefs between the respective liabilities of Conrail and George Munger. Accordingly, we also make no such distinction.

[4] The cases were also consolidated with claims by both plaintiffs against Whip City Spirits, Inc., which have been disposed of by settlement.

the "diamond." An old unused railroad station, no longer owned by Conrail, is located north of the east-west tracks and east of the spur tracks. Pochassic Street, a public way, lies just north of the railroad property which borders the river's northerly side. A public bridge, containing a pedestrian walkway, crosses the river about 500 feet east of the trestle bridge along Elm Street. When it reaches the north side of the river, Elm Street leads through an underpass beneath the east-west tracks to Pochassic Street.

For many years, teenagers, and sometimes adults, used the trestle bridge as a shortcut from the south side of the river to Pochassic Street. A path was beaten into the ground along this route from such use. No barriers prevented pedestrian use of the trestle bridge, and no signs on or about it warned of any danger. A person using the shortcut to reach Pochassic Street would have to cross the east-west railroad tracks at the "diamond". No planking or other device facilitated travel across the tracks, and there was no public or private crossing nearby.

The two youths left the playground mid-afternoon, crossed the trestle bridge, entered the diamond, and then walked onto the tracks, where they were struck by an eastbound Conrail freight train.

The complaints, seeking recovery under G. L. c. 258, the Massachusetts Tort Claims Act, allege that the city, as owner of the playground and adjacent property, acted negligently by failing to erect fences or barriers preventing access to the railroad trestle, to place warning signs on its property, or to provide more effective police patrol of the area. The judge ruled that, even assuming the city had a duty to take one or more of these steps, it was not liable because the duty was one owed to the public at large. Alternatively, the judge ruled that the decision whether to take any of the various safety measures urged was discretionary in nature and fell, therefore, within the discretionary function exception (G. L. c. 258, § 10 [*b*]) to liability under the Massachusetts Tort Claims Act. The plaintiffs contend on appeal that their claims relate to the city's failure, as a landowner, to maintain its property in a reasonably safe condition and warn of known dangers and, for that reason,

under *Doherty* v. *Belmont*, 396 Mass. 271, 273-274 (1985), neither the public duty nor the discretionary function exception had any applicability to the claims. ·

General Laws c. 258, § 2, as appearing in St. 1978, c. 512, § 15, provides in relevant part that "[p]ublic employers shall be liable for injury or loss of property or personal injury or death . . . in the same manner and to the same extent as a private individual under like circumstances . . ." We agree with the plaintiffs that in some situations a landowner's duty to exercise reasonable care does not terminate abruptly at the borders of his property but may extend to include a duty to take safety measures related to known dangers on adjacent property. See *Polak* v. *Whitney*, 21 Mass. App. Ct. 349, 351-352 (1985), and cases cited. Given the obviousness of the danger here, however, we doubt that a private landowner in the position of the city would be liable to one in the position of either of the plaintiffs' decedents. Certainly not every landowner with property abutting railroad tracks ought to be required to erect fences or barriers, to post warning signs, or to provide other protection, such as police patrols, with the goal of keeping people away from those tracks. Compare *Scurti* v. *New York*, 40 N.Y.2d 433, 441-442 (1976); *Lukasiewicz* v. *Buffalo*, 55 A.D.2d 848, 848-849 (1976); *Leone* v. *Utica*, 66 A.D.2d. 463, 466-467 (1979), aff'd, 49 N.Y.2d 811 (1980); Contrast *Mostert* v. *CBL & Associates*, 741 P.2d 1090, 1094 (Wyo. 1987).

We agree with the motion judge that one or more of the recognized Massachusetts Tort Claims Act exceptions applies and exempts the city from liability. It is certainly true, as the appellants contend, that if the plaintiffs' claims had to do with the physical condition of the city-owned premises, the city's reliance on the public duty exception, if not also the discretionary function exception, would be misplaced. See *Doherty* v. *Belmont*, 396 Mass. at 273-274. The plaintiffs' claims, however, differ significantly from the claim made in the *Doherty* case, which related to a defect in a municipal parking lot. In the present case, the potential danger, located on property owned by a different entity, across a river, and a considerable

distance away from any city property, particularly the playground, is too remote to justify the imposition of liability on the city based upon the condition of the premises. Furthermore, there is a broad range of alternative protective actions (for example, erection of a fence around the playground or around other city property bordering railroad tracks, erection of some other type of barrier, posting of some type of warning sign at one of a number of possible locations, or providing increased police patrol) the city allegedly could have taken. Whether or not the city ought to have done something more than it did to protect its citizens against the danger involved in the use of the shortcut, there is no reason why the case should not be governed by the general principles underlying the Massachusetts Tort Claims Act, including both the public duty and discretionary function exceptions. The recognition of these exceptions reflects the Legislature's intention to strike a balance between providing rights to individual claimants and protecting public employers against the potentially oppressive cost and inconvenience of defending broad generalized claims based upon allegations of failure to take some remedial action.

General Laws c. 258, § 10(*b*), as appearing in St. 1978, c. 512, 15, provides that a municipality is not liable for "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a public employer or public employee, acting within the scope of his office or employment, whether or not the discretion involved is abused." Given the judgment involved in weighing alternatives and making policy choices as to what safety measures to take, even if there was a duty on the part of the city to take some safety measures, we think the discretionary function exception was applicable. See *Patrazza* v. *Commonwealth*, 398 Mass. 464, 467-468 (1986). See also *Whitney* v. *Worcester*, 373 Mass. 208, 217-218 (1977); *Cady* v. *Plymouth-Carver Regional School Dist.*, 17 Mass. App. Ct. 211, 213-215 (1983); *Wightman* v. *Methuen*, 26 Mass. App. Ct. 279, 280-281 (1988). Compare *Smith* v. *United States*, 546 F.2d 872, 876-877 (10th Cir. 1976); *Ducey* v. *United States*, 713 F.2d 504, 515 (9th Cir. 1983).

Further, in order to bring their claims within the Tort Claims Act, the plaintiffs must show that the city owed their decedents a special duty of care beyond that owed to the public at large. See *Dinsky* v. *Framingham*, 386 Mass. 801, 810 (1982); *Ribeiro* v. *Granby*, 395 Mass. 608, 613 (1985); *Nickerson* v. *Commonwealth*, 397 Mass. 476, 478 (1986); *Appleton* v. *Hudson*, 397 Mass. 812, 815 (1986); *Nolan* v. *Parker*, 15 Mass. App. Ct. 475, 477-478 (1983). In *Appleton* v. *Hudson*, the plaintiffs resided on a street which had been the site of numerous traffic accidents and fatalities. A local club, licensed by the city's selectmen, had repeated problems with drinking by minors. The plaintiff and her husband complained to the police about underage drinking at the club and about dangerous traffic conditions on their street. Some months later, the plaintiff was injured and her husband killed when a vehicle being driven by an intoxicated youth on their street at high speed and in the wrong lane collided with their car. Recovery was sought on the basis of the city's negligent failure to provide traffic safety on the plaintiffs' street and to enforce liquor licensing laws prohibiting the service of liquor to minors. The court held that the plaintiffs had no remedy under the Massachusetts Tort Claims Act. *Id.* at 816. "[T]here was no foreseeably identifiable perpetrator whom the town negligently failed to remove from the highways," the risk was not "immediate," and the dangerous conditions had continued for a considerable period of time. *Ibid.* Thus, the court held, even if the town officials "ought to have done something," the "case present[ed] a 'relatively leisurely course of events.'" *Ibid.*, citing *Irwin* v. *Ware*, 392 Mass. 745, 756 (1984). The duty owed by the city was, therefore, only a generalized one and not one owed to specific individual members of the public.

In *Irwin* v. *Ware*, recovery for injuries and death had been allowed against a town for the negligent failure of police officers to remove an intoxicated driver from the highway who later injured a member of the public. We agree with the motion judge that the present case is more like *Appleton* v. *Hudson* than *Irwin* v. *Ware*. The potential danger to youths using the trestle bridge as a shortcut to neighborhoods across the river had

existed for years. Unlike the situation in *Irwin*, there was no particular perpetrator at large who presented a danger of immediate harm to the youths at the time of the accident, and they had a chance to protect themselves from a danger which was obvious. In these circumstances, the city is not liable for the harm that befell the youths.

2. *The Cases Against Conrail Under the Wrongful Death Act, G. L. c. 229.*

Additional facts relating to the cases against Conrail, viewed most favorably to the plaintiffs, include the following. The two youths proceeded from the city playground across the railroad trestle bridge and towards the more southerly of the east-west set of tracks. One of them was carrying a large radio or tape deck on his shoulder. As they entered the eastbound track, a train was approaching on the westbound track and was making a great deal of noise. They stood on the eastbound track waiting for the westbound train to go by. They did not know that an eastbound train was also approaching and that they were standing directly in its path until just before being struck by it. According to the train's engineer, they turned at the last moment and looked at it in terror with "their eyes popping."

The train which struck the youths had been travelling at forty-two miles per hour. The legal speed limit for the train in that location was forty miles per hour. As the train approached the area of the tracks known as the "diamond," the engineer had a view in front of him extending about 600 feet. As he approached the "diamond," the engineer saw a person (not one of the plaintiffs' decedents) who had been standing on the south side of the tracks start to run toward the tracks. He sounded the train whistle but did not apply the brakes. When he looked back at the tracks, he saw two youths standing on the tracks directly in front of the train about three car lengths away. He immediately put on his emergency brake and continued to sound his whistle, but it was too late to avoid hitting the youths.

The operator of the eastbound freight train which struck the youths and the operator of the westbound freight train were in radio contact with each other, possibly through a dispatcher, from the time the eastbound train was three quarters of a mile away from the "diamond." It is Conrail's usual procedure for an engineer who sees persons on railroad tracks in the vicinity ahead of an oncoming train to notify the engineer of the other train. Conrail procedures also require any conversations with the dispatcher to be recorded. The tape of any conversations preceding the accident, however, is missing. Conrail made a separate tape recording the speed of the eastbound train. It was also Conrail policy to preserve such speed tapes for possible use in litigation for trains involved in accidents. The Conrail employee in charge of the speed tape for the train involved in this case first reported that no tape had been made. The speed tape turned up later, however, and it indicated that the maximum speed limit had been exceeded. William Everding, a Conrail employee who had been assigned to investigate the accident, and who also answered interrogatories on behalf of Conrail, told Joseph A. and Edna M. Lajeunesse, the parents of one of the two youths, that the eastbound train conductor had been alerted by radio to the presence of people on the track ahead.

a. *Was the case within the exception in the Wrongful Death Act applicable to railroads?* The motion judge ruled that the railroad was not liable to the plaintiffs under the Wrongful Death Act, G. L. c. 229, § 2, as in effect prior to St. 1981, c. 493, § 1, for negligence because it had taken no action, such as putting down planking or constructing something along the tracks, which would have led members of the public to believe they had a right to cross the tracks at the location of the accident. Relying on *Mounsey* v. *Ellard*, 363 Mass. 693, 707 & n.7 (1973), the plaintiffs contend that the railroad's passive acquiescence in the public's use of the tracks as a shortcut to Pochassic Street caused the youths to be "lawful visitors," not trespassers, and the railroad was liable, therefore, for ordinary negligence.

General Laws c. 229, the Wrongful Death Act, has a specific exception applicable to railroads. Section 2 of the statute provides that "a person operating a railroad shall not be liable for negligence in causing the death of a person while walking or being upon such railroad contrary to law or to the reasonable rules and regulations of the carrier." For an analysis of the purpose and statutory history of the railroad exception, which dates back to 1853, see *Owen* v. *Meserve*, 381 Mass. 273, 276-277 (1980), cert. denied, 449 U.S. 1082 (1981).

The railroad's liability to the plaintiffs for negligence in this case depends upon whether the two decedents were on the railroad tracks "contrary to law." General Laws c. 160, § 218, as in effect prior to St. 1987, c. 501, § 3, provides, "Whoever without right knowingly stands or walks on a railroad track shall forfeit not less than five nor more than fifty dollars." As the statute makes it a criminal offense to stand on railroad tracks, except, presumably, at a recognized public or private crossing, the decedents' presence on the tracks at the time of the accident was "contrary to law." Indeed, violation of G. L. c. 160, § 218, suffices in and of itself to bring the railroad exception of the Wrongful Death Act into play, even where the railroad has reason to anticipate that persons might be on the tracks at a particular location. See *Corrado* v. *New York, N.H. & H. R.R.*, 333 Mass. 417, 418-419 (1956); *Jad* v. *Boston & Maine Corp.*, ante 564 (1988). Compare *Miller* v. *Boston & Maine Corp.*, 8 Mass. App. Ct. 770, 772 (1979).

The parties call our attention to numerous cases against railroads predating the 1973 *Mounsey* v. *Ellard* decision, *supra*, involving common law tort claims for nonfatal injuries caused by moving trains. As the question of liability in those cases turned on the injured party's status as an invitee rather than either a licensee or trespasser, they shed no light on the relevant issue in this case. Furthermore, even the distinction between a trespasser and a nontrespasser may not be precisely the appropriate one in light of the cases cited interpreting language such as presently appears in § 2 of the Wrongful Death Act. As proof of a violation of G. L. c. 160, § 218, is enough to invoke the railroad exception, Conrail would not be liable to the plaintiffs for ordinary negligence.

b. *Was there liability under the Wrongful Death Act for wilful, wanton or reckless conduct?* The motion judge recognized that under G. L. c. 229, § 2, the railroad would be liable to the plaintiffs for punitive damages if the plaintiffs proved that the railroad or its agents engaged in "wilful, wanton or reckless conduct."[5] See *Owen* v. *Meserve*, 381 Mass. at 277. However, the motion judge considered the factual material produced by the plaintiffs in opposition to the summary judgment motion insufficient to prove such conduct. We think, after reviewing those materials, that the plaintiffs have presented an issue for trial concerning the railroad's possible recklessness.

Wilful conduct has been described as action intended to do harm, while conduct is wanton or reckless when "in the face of a known or obvious risk [one] intentionally persist[s] in conduct involving a high degree of probability that substantial harm would result to another." *Desmond* v. *Boston Elev. Ry.*, 319 Mass. 13, 16 (1946), and cases cited. See also *Siver* v. *Atlantic Union College*, 338 Mass. 212, 216 (1958); Restatement (Second) of Torts § 500 comments (a) and (g) (1965).

We agree with the motion judge and the railroad that excess speed and inadvertence, by themselves, do not constitute recklessness. This would be so even assuming that railroad employees knew that people often crossed the tracks at the "diamond." There is an indication of something more here, however, which may emerge at trial as a legitimate issue for the jury. We put aside for the moment the question of the eventual admissibility of some of the additional evidence.

There is evidence of radio communication between the operators of the two freight trains approaching the "diamond" from opposite directions. If the operator of the westbound train or the dispatcher warned the operator of the eastbound train of the presence of the two youths on the tracks in time to avoid the accident, and the eastbound train's operator did not im-

---

[5] The motion judge ruled that if G. L. c. 229, § 2 (the railroad exception) applied, liability based on gross negligence was also precluded. The plaintiffs have not argued on appeal that that ruling was erroneous.

mediately attempt to stop the train, a jury could find that operator reckless.[6] The Lajeunesses state that Everding, the Conrail investigator, told them that such a warning was given. Moreover, depending upon other evidence produced and admitted, it may be a reasonable inference that such a conversation between the two train operators, whether or not through the dispatcher, actually did take place. This inference could be drawn from the following set of circumstances: the tape of the dispatcher's conversations with the operators existed at one time; the possibility of litigation after the accident ought to have been immediately obvious; Conrail had a policy to preserve such tapes; the tape no longer exists; and the speed tape which was uncovered, after its existence had been denied by the railroad, contained information damaging to Conrail's case. See *Graci* v. *Massachusetts Gas & Elec. Light Supply Co.*, 7 Mass. App. Ct. 221, 224 (1979); *Schleifstein* v. *Greenstein*, 9 Mass. App. Ct. 344, 350 (1980); *Marquis Theatre Corp.* v. *Condado Mini Cinema*, 846 F.2d 86, 89 (1st Cir. 1988).

A finding of recklessness would be warranted, in our view, upon a showing that the operator of the eastbound train was aware of the presence of the two youths in the vicinity of the tracks in time to have stopped. There is no direct evidence from the westbound operator or the dispatcher in the materials

[6] There is also evidence that Conrail's policy required that an operator of a train inform the operator of an oncoming train of the presence of any persons seen in the vicinity of the oncoming train's tracks. The operator of the westbound train was in a position to see and may have seen the two youths standing on the eastbound tracks as they waited for his train to pass. The operator of the westbound train ought reasonably to have known that the eastbound train operator's view of the tracks might be obscured by the oncoming westbound train and that the individuals on or near the tracks would have difficulty hearing the approach of the eastbound train because of noise of the passing westbound train. He also ought reasonably to have known that the likely result of a train striking a person on the tracks would be that person's death. If the westbound train's operator, or, as a result of radio communications, the dispatcher, knew that the two youths were in serious danger of being killed and had the opportunity to, but did not, warn the eastbound train's engineer in time for him to avoid the accident, it may be that a jury could find recklessness on the part of the railroad. Because of the possibility of a further appeal should a jury find recklessness, it would be advisable for the trial judge to pose special jury questions focusing separately on the actions and knowledge of the two operators.

produced on the summary judgment motion, and Munger, the operator of the eastbound train, denied any awareness of the presence of the youths on the tracks until the last moment. The facts that the youths were seen earlier and that the eastbound train's operator had been warned, however, could be proved either by the admission of Everding's statement to the Lajeunesses or by allowing the jury, based upon the missing tape, to draw an inference that the two train operators had a conversation about the youths' presence on the tracks. It may be that before a jury is impanelled, a judge should hold a preliminary hearing to resolve these evidentiary issues.

Everding's statement to the parents would be admissible as an admission by Conrail if it was found to have been made within the scope of his authority and in the course of his employment for Conrail. See *Ruszcyk* v. *Secretary of Pub. Safety*, 401 Mass. 418, 423 (1988); *Boylston-Washington, Inc.* v. *Alcoholic Beverages Control Commn.*, 8 Mass. App. Ct. 396, 399 (1979); McCormick, Evidence § 267 (3d ed. 1984); Fed.R.Evid. 801(d)(2)(C) & (D); Proposed Mass.R.Evid. 801(d)(2)(D) and 403. Compare *Parsons* v. *Dwightstate Co.*, 301 Mass. 324, 327 (1938); *Barrett* v. *Wood Realty Inc.*, 334 Mass. 370, 374 (1956); *Bristol Wholesale Grocery Co.* v. *Municipal Lighting Plant Commn.*, 347 Mass. 668, 671 (1964), *Leone* v. *Doran*, 363 Mass. 1, 16 (1973), and cases cited; *In-Towne Restaurant Corp.* v. *Aetna Cas. & Sur. Co.*, 9 Mass. App. Ct. 534, 542 (1980). The fact that Everding signed interrogatories on behalf of Conrail gives some indication that when he made the statement to the Lajeunesses he was acting as Conrail's agent. It will also be important for the trial judge to know whether Everding based his statement on first hand knowledge, as opposed to unsubstantiated rumor. See *Ruszcyk* v. *Secretary of Pub. Safety*, 401 Mass. at 424.

Whether to permit the jury to draw an inference adverse to Conrail about the radio conversation between the two train engineers, based upon the absence of a tape recording of the conversation, would depend upon the development of facts about the tape and the circumstances of its disappearance.

Conrail produced no material before the motion judge to show that Everding lacked authorization to make a statement to the Lajeunesses about the accident. Conrail's appellate brief does not address the admissibility of Everding's statement to the Lajeunesses, other than to describe it as "totem-pole hear-say." Nor did Conrail produce any evidence concerning the handling of the missing tape. Other than to state, incorrectly we think, that there is no evidence that such a tape recording was ever created, Conrail does not counter the plaintiffs' argument that the disappearance of the tape might justify an adverse inference about the content of the train operators' conversation.

The plaintiffs have produced evidence, possibly admissible, in opposition to Conrail's motion for summary judgment, which would warrant a finding of recklessness, that is, persistence by the railroad in highly dangerous conduct in the face of a known risk. That showing is sufficient, in our view, to overcome Conrail's motion for summary judgment and to entitle the plaintiffs to proceed to trial, or, at least, to a preliminary hearing to determine the facts relevant to the evidentiary issues.

c. *Was there liability for conscious pain and suffering?* The railroad exception in the Wrongful Death Act does not apply to a claim under G. L. c. 229, § 6, for conscious pain and suffering. Such a claim is based upon common law tort principles and is a separate cause of action from any claim for wrongful death. See *Dermody* v. *Utley*, 328 Mass. 209, 211 (1952); *Gaudette* v. *Webb*, 362 Mass. 60, 62 (1972).

The motion judge based his ruling that the plaintiffs could not recover on a negligence theory for their decedents' conscious pain and suffering based on the decedents' status as trespassers upon the railroad tracks when they were struck. He ruled that common law tort principles preclude their recovery. The plaintiffs admitted that neither of the decedents was a child too immature to discover the dangerous condition or to realize the risk involved in his conduct. See *McDonald* v. *Consolidated Rail Corp.*, 399 Mass. 25, 31 (1987). Compare *Soule* v. *Massachusetts Elec. Co.*, 378 Mass 177, 182 (1979); G. L. c. 231, § 85Q. Nor did the plaintiffs claim that railroad employees knew the decedents to be helplessly trapped in a

position of peril. Compare *Pridgen* v. *Boston Housing Authy.*, 364 Mass. 696, 707 (1974). The facts, thus, did not bring the decedents within any recognized exception to the general rule that trespassers may not recover from a property owner based upon proof of the owner's ordinary negligence. See *Mounsey* v. *Ellard*, 363 Mass. at 707 n.7; *Schofield* v. *Merrill*, 386 Mass. 244, 245-246 (1982). In *Schofield* v. *Merrill*, 386 Mass. at 246, 253,[7] it was held that a possessor of real estate owes even a foreseeable adult trespasser a duty only to refrain from wilful, wanton or reckless conduct. The plaintiffs contend that, because of the railroad's passive acquiescence in their presence, their decedents were not trespassers.[8] Because we decide this part of the case on a different ground, however, we need not decide whether the circumstances were such as to give rise to a

---

[7] The parties in the *Schofield* case assumed that the plaintiff trespassed when, not seeing any barrier or warning signs, and aware that others were doing the same, he went to a quarry to swim. *Id.* at 425. The defendants in that case had made repeated efforts to prevent the public from entering the quarry site. *Ibid.* In the present case, by contrast, the railroad made no such efforts to keep the public away, and railroad employees knew of the public's use of the property for a shortcut.

[8] A trespasser has been defined as "a person who enters or remains upon land in the possession of another without a privilege to do so, created by the possessor's consent or otherwise." Restatement (Second) of Torts, § 329 (1965). The precise dividing line between a trespasser and a nontrespasser for common law tort liability purposes has not been defined in Massachusetts. See *Mounsey* v. *Ellard.* 363 Mass. at 717-718 (Kaplan, J., concurring). Generally, whether one is a trespasser depends upon the consent of the owner. Unquestionably there would be no liability for ordinary negligence on the part of a property owner to an outlaw or a person whose presence is unforeseen. An owner's passive acquiescence in continued use of his property by members of the public, absent any reasonably effective steps to discourage such use, might create in some individuals a reasonable belief that the owner consented to such use. In that situation, the user might not be a trespasser. We doubt, however, that the plaintiffs' decedents could reasonably have concluded that the railroad consented to their presence at the time of the accident on the tracks. This is because of the command of the statute, G. L. c. 160, § 218, which made it a crime to be on the railroad tracks except at any established crossing. If liability for negligence were imposed on the railroad, in the circumstances, the presence of the youths on the tracks in violation of G. L. c. 160, § 218, would certainly raise an issue of comparative negligence. See *Lane* v. *Meserve*, 20 Mass. App. Ct. 659, 663 n.6 (1985).

common law duty on the part of the railroad to warn the youths of the danger or to take some other safety precautions.

In his memorandum of decision, the motion judge questioned whether the plaintiffs could recover on the conscious pain and suffering claims where the only evidence was that any suffering preceded the actual collision. Most of the cases discussing the right to recover damages for conscious pain and suffering when death occurs refer to suffering which follows the injury but precedes death. See, e.g., *Royal Indem. Co.* v. *Pittsfield Elec. Co.*, 293 Mass. 4, 8 (1935); *Campbell* v. *Romanos*, 346 Mass. 361, 367 (1963); *Carr* v. *Arthur D. Little, Inc.*, 348 Mass. 469, 475-477 (1965). The plaintiffs contend that, notwithstanding its usual formulation, the rule is not so inflexible as to foreclose recovery for conscious pain and suffering which precedes an injury but is as inextricably connected to a real injury as the sudden fear of almost certain impending death was in this case. See *Bullard* v. *Central Vt. Ry.*, 565 F.2d 193, 197 (1st Cir. 1977) ("fright just before the accident, when collision was imminent and he jumped" was compensable mental distress). Compare *Kennedy* v. *Standard Sugar Ref.*, 125 Mass. 90, 92 (1878) (mental distress experienced during a twenty-foot fall before hitting the ground might be compensable). The plaintiffs' contention has some logical appeal but we are not persuaded by it. It is not at all uncommon for victims of sudden, fatal accidents to experience momentary fright prior to impact such as the plaintiffs' decedents experienced. Yet the relevant period for purposes of measuring compensation for conscious pain and suffering has consistently been defined in our appellate decisions as commencing with the impact of the fatal injury. Assuming that limitation to have been intentional, we hesitate to extend the right to recover for conscious pain and suffering to pre-impact fright.

Accordingly, the entry of summary judgments in favor of the defendants is affirmed as to all plaintiffs and as to all counts, except that the cases against the defendants Conrail and George Munger may stand for trial on the claims for

punitive damages under G. L. c. 229, § 2, based on the allegation of reckless misconduct.

*So ordered.*

A    End Of Dike

B    Beginning Of Trestle Bridge

C    Point Of Accident

D    Pochassic Street - Direct Line From Diamond

E    Pochassic Street - Direct Line From Overpass

F    Railroad Overpass Over Public Road

G    Beginning Of Public Crossing Bridge

H    Point On Pochassic Street Closest To Diamond