**Cindy L. BEAUSOLEIL, Plaintiff,**

v.

**NATIONAL RAILROAD PASSENGER CORP., Defendant.**

**C.A. No.  98–11503.**

United States District Court,
D. Massachusetts.

June 8, 2001.

Francis J. Lynch, III, Lynch & Lynch, Susan E. Sullivan, Lynch & Lynch, South Easton, MA, for Cindy L. Beausoleil, Administratrix of the Estate of Danielle Beausoleil, Plaintiffs.

Michael McCormack, McCormack & Epstein, Amy M. Soisson, McCormak & Epstein, Elizabeth Graham, Fitzhugh & Associates, Boston, Thomas P. O'Reilly, Curtin, Murphy & O'Reilly, PC, Boston, MA, Terri–Lynne Neville, Round Rock, TX, Mark S. Landman, Landman Corsi Ballaine & Ford, P.C., New York City, for Massachusetts Bay Transportation Authority, National Railroad Passenger Corp, Defendants.

## MEMORANDUM AND ORDER

WOLF, District Judge.

This memorandum is based upon the transcript of the decision rendered orally on May 30, 2001, in which the court allowed the motion of defendant National Railroad Passenger Corporation ("Amtrak") for reconsideration of the court's March 30, 2001 decision regarding preemption of the plaintiff's excessive speed claims and denied the defendant's renewed motion for summary judgment. This memorandum adds citations, deletes some colloquy, clarifies some language, and amplifies the discussion of federal preemption.

\*   \*   \*   \*   \*   \*

The court is reconsidering the decision rendered with regard to Amtrak on March 30, 2001, in part because Amtrak has persuasively argued that the March 30, 2001, decision interpreted too expansively the exception to the federal preemption of state laws concerning train speed, described by the Supreme Court in *C.S.X. Transp., Inc. v. Easterwood,* 507 U.S. 658, 675, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993).

█ In general, state tort law claims for excessive speed are preempted by the Federal Railroad Safety Act ("FRSA") if the train is operating within federally prescribed speed limits, as was the Amtrak train in this case. *Easterwood,* 507 U.S. at 675, 113 S.Ct. 1732. In *Easterwood,* the Court held that "federal regulations adopted by the Secretary of Transportation preempt respondent's negligence action insofar as it asserts that petitioner's train was traveling at an excessive speed." *Id.* In *Easterwood,* the Supreme Court did not decide whether the preemption of the plaintiff's excessive speed claim would bar a suit for "breach of related tort law duties, such as the duty to slow or stop a train to avoid a specific, individual hazard." 507 U.S. at 675 n. 15, 113 S.Ct. 1732. It did, however, make it clear that general claims that "petitioner's train was traveling too quickly given the 'time and place'" were preempted by its holding. *Id.*

█ Courts have generally found that there is an exception to preemption for claims involving specific, individual hazards, but have interpreted that exception narrowly. In *Armstrong v. Atchison,*

*Topeka & Santa Fe Railway Company,* 844 F.Supp. 1152, 1153 (W.D.Tex.1994), the court stated that the " 'specific, individual hazard' identified by the *Easterwood* court logically relates to the avoidance of a specific collision" and held that claims based on the failure to slow or stop while approaching a dangerous grade crossing in a high traffic area were preempted by federal law. In *Herriman v. Conrail, Inc.,* 883 F.Supp. 303, 307 (N.D.Ind.1995), the court held that excessive speed claims based on the low visibility of train's headlights because of surrounding artificial lights was not a "specific, individual hazard" because the background lights were continuously on at that crossing. In *O'Bannon v. Union Pacific Railroad Co.,* 960 F.Supp. 1411, 1421, the court stated that the local hazard "cannot be statewide in character and cannot be capable of being adequately encompassed within uniform, national standards." It held that excessive speed claims based on inadequate warning devices, the grade of a crossing and proximity to a highway were preempted. *Id. See also, Seyler v. Burlington Northern Santa Fe Corp.,* 102 F.Supp.2d 1226, 1237 (D.Kan.2000) (claim that railroad was negligent in failing to slow or stop train because of flash flood warnings was preempted); *Cox v. Norfolk and Western Railway Company,* 998 F.Supp. 679, 687 (S.D.W.Va.1998) (claim related to speed at snow-covered crossing preempted).

One of the few cases in which claims that a railroad was liable for failing to stop or slow a train operating within federally proscribed speed limits were held not to be preempted by the FRSA is *Missouri Pacific R. Co. v. Lemon,* 861 S.W.2d 501, 510 (Ct.App.Tex.1993). *Lemon* concerned allegations that a train engineer failed to reduce his speed even though his vision of an upcoming crossing was obscured by several "illegally and improperly parked tank

cars." *Id.* The court in *Lemon* held that the claims involving excessive speed were not preempted by federal law, noting that the "improper parking of tank cars which obstruct the view of a crossing is not a hazard which the Secretary took into consideration when determining train speed limits under the FRSA." *Id.*

In *Bakhuyzen v. National Rail Passenger Corporation,* 20 F.Supp.2d 1113, 1117 (W.D.Mich.1996), the court found that claims that a train should have slowed due to an obstructed view, the lack of crossing protections and knowledge that the crossing was dangerous were preempted by federal law. It held, however, that the claim that the engineer should have slowed the train in response to dangerous weather conditions was not preempted by the FRSA. *Id.*

In view of the foregoing, this court now concludes that, in the context of this case, the exception to federal preemption of excessive speed claims includes only specific, individual hazards such as a trespasser seen or otherwise known to the operator of a train to be on the tracks at a particular time. It does not include general knowledge of a chronically dangerous condition, such as the knowledge that disembarking passengers often illegally crossed the tracks at the Attleboro, Massachusetts station that is involved in this case.

Reconsideration of the denial of Amtrak's motion for summary judgment is also appropriate because in the March 30, 2001 decision, the court found that, pursuant to the Operating Agreement between them, Amtrak and the MBTA jointly operated the commuter station in Attleboro, where Danielle Beausoleil was struck, and shared a duty to maintain that station. In view of this finding, the court further found that the two defendants could be held jointly liable, and analyzed their cu-

mulative actions or inaction to determine whether a jury could properly find recklessness.

At a hearing on May 24, 2001, however, the plaintiff indicated that it would be prudent and appropriate to decide Amtrak's liability based only on its own conduct, rather than on a theory of potential joint liability. Despite an Operating Agreement that is ambiguous on this point, the court agreed to narrow the focus accordingly.

In addition, on May 29, 2001, the plaintiff settled with the MBTA. Among other things, this eliminated from the evidence to be presented at trial the warning of the danger at the Attleboro station provided to the MBTA by State Representative John Lepper because it was stipulated that his letter was never forwarded by the MBTA to Amtrak.

Therefore, in these unusual circumstances, the court has considered Amtrak's motion for summary judgment *de novo*. It again finds that it should be denied.

The standards for deciding a motion for summary judgment are described in the March 30, 2001 decision. In essence, the court must look at the evidence in the light most favorable to the plaintiff and decide whether a jury could properly find for her.

■ As set forth in the March 30, 2001 decision, Danielle Beausoleil was a trespasser at the time that she was hit by the Amtrak train at the Attleboro station. Therefore, under Massachusetts law, Amtrak can only be held liable if it was reckless and its recklessness was a proximate cause of Danielle Beausoleil's death. *See* M.G.L. c. 229, § 2; *Corrado v. New York,*

*New Haven & Hartford R.R. Co.,* 333 Mass. 417, 131 N.E.2d 201 (1956).

■ As the Massachusetts Supreme Judicial Court held in *Sandler v. Commonwealth of Massachusetts,* 419 Mass. 334, 336, 644 N.E.2d 641 (1995), a reckless failure to act involves an intentional or unreasonable disregard of a risk that presents a high degree of probability that substantial harm will result to another.[1]

■ Viewed in the light most favorable to the plaintiff, the relevant facts in this case include the following. The MBTA owned the train and station involved in Danielle Beausoleil's death. It had an Operating Agreement with Amtrak. Amtrak provided all of the personnel involved in this case, including those individuals who dealt with disembarking passengers and who operated the train on which Danielle Beausoleil was traveling.

Amtrak had the authority to improve unilaterally the signage and the personnel or police presence at the Attleboro station. Under the Operating Agreement, however, Amtrak could not alter the intertrack fencing at the Attleboro station without the approval of the MBTA.

On the date of Danielle Beausoleil's accident, January 3, 1998, signs and fencing were used at the Attleboro station to deter people from crossing the railroad tracks. There were three sets of tracks at that location. There were fences between the tracks with 39-foot overlaps which, in effect, required anyone trying to walk across the tracks to do so in an S pattern.

At the edge of the platform on which Danielle Beausoleil disembarked, there was a yellow strip with the words "stand back." There were also signs on the inter-

---

1. A more detailed description of the standard for recklessness is contained in the instruction given to the jury in this case, which found that the plaintiff had proven that Amtrak was reckless. That instruction, annotated to include several citations, is attached hereto as Exhibit A.

track fences that stated "danger, walking across tracks forbidden; warning, high speed trains, stand back; danger, high speed trains, do not cross tracks."

Stairs led from the platform to a pedestrian underpass providing a safe passageway to the platform on the other side of the station. Danielle Beausoleil had used a similar underpass at another station earlier on January 3, 1998. She had also attended an Amtrak presentation regarding the hazards of crossing tracks at commuter stations.

Although Amtrak took these measures to deter illegal crossings at the Attleboro station, as of January 3, 1998, Amtrak knew that they were not effective in preventing passengers from regularly walking across the tracks.

As described in the March 30, 2001 decision, as of the date of Danielle Beausoleil's death, the defendants had long known that many passengers, including children, were crossing the tracks at the Attleboro station after disembarking from commuter trains. They also knew that the signs that had been posted were not effectively deterring the crossings and that the fencing was not effectively preventing them.

Indeed, Amtrak had informed the MBTA in 1996 that there was a considerable safety issue and a need to deal with it quickly. However, this was not done by the time Danielle Beausoleil was struck and killed 17 months later.

More specifically, on August 12, 1996, William B. Duggan, the General Manager of the New England division of Amtrak, wrote to John J. Brennan, III, Director of Railroad Operations at the MBTA, stating the following:

It was recently brought to Amtrak's attention that Commuter Rail passengers are disembarking and then trespassing at the Main Line Tracks at the Attleboro Station. This is being accomplished by crossing within the track structures around the ends of the existing inter-track fencing. The Amtrak police have been notified, however, it is nearly impossible to maintain the physical presence on site for the arrival of each and every train.

It is human nature to take the "easiest route." In order to combat this problem, measures should be taken to deter passengers from using this egress route. As safety is paramount to both our organizations and this is also a concern at other stations (Canton, Mansfield) as well, it may be in the mutual interest of both parties to develop a plan of action that will encompass a combination of warning signs, fence extension and increased surveillance by both Amtrak and MBTA police.

As this situation represents a considerable safety issue, it is important to move quickly on this issue. Please contact me to discuss the action plan and associated funding sources relative to this issue. If you have any questions, please contact me.

On August 22, 1986, Mr. Brennan responded to Mr. Duggan and requested that Amtrak develop a specific plan. He agreed that the situation warranted action and stated that it had to be addressed expeditiously.

On September 4, 1996, Mr. Duggan directed a member of his staff to prepare the requested plan. On November 1, 1996, Amtrak sent to the MBTA a detailed plan to improve the intertrack fencing.

As indicated earlier, the approval of the MBTA was required for Amtrak to make any changes to the property at the Attleboro station, including the fences. Amtrak received no response to the detailed plan sent to the MBTA on November 1, 1996.

Between November 1, 1996 and January 3, 1998, Amtrak did not follow up with the MBTA concerning its proposal. Nor did Amtrak improve the signage at the Attleboro station to direct passengers to the pedestrian underpass or strengthen the warnings concerning crossing the tracks. In addition, Amtrak did not put personnel at the station to direct passengers to the underpass after they disembarked from commuter trains or instruct its personnel on the trains to do so.

Rather, on January 3, 1998, Amtrak dropped Danielle Beausoleil and others off at the Attleboro station from one of its commuter trains. Amtrak knew that such commuters regularly crossed the tracks illegally. Amtrak also knew that another train was scheduled to come down those tracks several minutes later. Personnel on the train did not direct Danielle Beausoleil or other passengers to the pedestrian underpass. Amtrak had no personnel at the station to do so.

In these circumstances, the jury could properly find that Amtrak was reckless and that its recklessness caused Danielle Beausoleil's death.

While the facts upon which the court relies in reaching this conclusion are somewhat different than the facts on which it relied in the March 30, 2001 decision, the analysis of the law remains essentially the same except for the issue of preemption concerning the speed of the train addressed earlier. While the court does not mean to qualify the discussion of the full range of relevant cases in the March 30, 2001 decision, it notes the following.

Among other things, it is not appropriate to analyze the plaintiff's claims as presenting only discrete duty to warn or duty to fence claims. Rather, it is permissible and appropriate to assess the evidence concerning the totality of the circumstances.

The court continues to find this case distinguishable from the cases on which Amtrak primarily relies, essentially for the reasons described in the March 30, 2001 decision. For example, in *Sawler v. Boston & Albany R.R. Company*, 339 Mass. 34, 36, 157 N.E.2d 516 (1959), the court was primarily addressing the issue of whether the plaintiff was a trespasser. *Sawler* deals with fences generally along a railroad's right of way. *Id.* at 35, 157 N.E.2d 516. It did not involve a railroad dropping people off and knowing when they would foreseeably and illegally cross the tracks. *Id.*

Similarly, *Gage v. City of Westfield*, 26 Mass.App.Ct. 681, 683–84, 532 N.E.2d 62 (Mass.App.1988), did not deal with passengers being dropped off by a railroad at times when the railroad knew they would be crossing the tracks at a particular place. Moreover, the language in *Gage* on which Amtrak relies, to the effect that there would be no recklessness even if the railroad employees knew that people often crossed the tracks at a particular place, is dicta. *See* 26 Mass.App. at 691, 532 N.E.2d 62.

In essence, the court continues to find this case most analogous to *Inferrera v. Town of Sudbury*, 31 Mass.App.Ct. 96, 575 N.E.2d 82 (Mass.App.1991). In *Inferrera*, the granting of a motion for summary judgment for the defendants, the Town and a recreational club, in a wrongful death action involving a trespasser, was reversed because the evidence was deemed sufficient to prove recklessness. *Id.* at 102, 575 N.E.2d 82.

In *Inferrera*, a snowmobiler trespassing on land owned by the town died after hitting a cable strung between two trees. The cable was not marked or flagged, but one of the trees had a no trespassing sign that was visible at close range. *Id.* at 98,

575 N.E.2d 82. The decedent and his friends had seen a similar cable at another part of the land. *Id.* The cable was strung by a club that had permission to use the land, but the town had the responsibility of maintaining the cable. *Id.* at 99, 575 N.E.2d 82. The Massachusetts Appeals Court held that the question of whether the defendants were reckless should have been presented to the jury, noting that the gravity of the danger posed by the cable was shown by the injuries to the plaintiff, and that the defendants knew or should have known that their conduct "created an easily perceptible danger of death or substantial physical harm." *Id.* at 101–02, 575 N.E.2d 82.

The court continues to find that the evidence against Amtrak in this case is at least as strong as the evidence in *Inferrera.* Therefore, based on the present record, the court again finds that Amtrak is not entitled to summary judgment on the issue of whether it was reckless.

Accordingly, Amtrak's renewed motion for summary judgment (Docket No. 87) is hereby DENIED.

## APPENDIX A

*Beausoleil v. National Railroad Passenger Corp.*
*("Amtrak")*

Jury Instruction on Recklessness

June 4, 2001

In this case, Amtrak operated a railroad which sent trains through the Attleboro, Massachusetts station.

At the time of the accident involved in this case Danielle Beausoleil was on the railroad tracks at the Attleboro station. This was illegal under Massachusetts law. M.G.L. c. 160, § 218. Danielle was, therefore, what is called a trespasser.

Amtrak, which operates through its employees, had a duty not to be reckless with regard to the safety of trespassers. M.G.L. c. 229, § 2.

In the context of this case, recklessness may consist of a failure to act as well as affirmative conduct. *Sandler v. Commonwealth,* 419 Mass. 334, 336, 644 N.E.2d 641 (1995). This case involves an alleged breach of a duty to remedy or guard against a known or reasonably knowable dangerous condition. *Id.*

To prove that Amtrak was reckless in this case, plaintiff must prove that Amtrak intentionally or unreasonably disregarded a risk that presented a high degree of probability that substantial harm would result to another. The risk of death or grave bodily injury must have been known or reasonably apparent to Amtrak, and the harm must have been a probable consequence of Amtrak's election to run that risk or its failure to reasonably recognize it. *Id.*

To intentionally disregard a risk means to ignore or neglect it deliberately, rather than by accident or mistake.

To unreasonably disregard a risk means to ignore or neglect a risk that a person of ordinary prudence would act to reduce or eliminate. *Id.* at 337, 644 N.E.2d 641; *Romana v. Boston Elev. Ry.,* 218 Mass. 76, 82–83, 105 N.E. 598 (1914).

In this case, plaintiff must also prove that any risk that was intentionally or unreasonably disregarded involved a high probability of substantial harm. This means that plaintiff must prove that substantial harm was more than a foreseeable possibility or likely to occur. Rather, plaintiff must prove that a reasonable person in Amtrak's position would recognize that substantial harm was highly likely to occur. Plaintiff does not, however, have to

prove that substantial harm was certain to occur. *See Black's Law Dictionary* 1201 (6th ed.1990).

"Substantial harm" means serious bodily injury or death. *Sandler*, 419 Mass. at 336–37, 644 N.E.2d 641.

So, to prove recklessness, plaintiff must prove that there was a high probability that a person would be seriously injured or killed crossing the tracks at the Attleboro station and that Amtrak intentionally or unreasonably disregarded that risk.

The mere fact that an accident occurred does not mean that Amtrak was reckless. Moreover, in this case, it would be insufficient for the plaintiff to prove only what is called negligence, which is a failure to use reasonable care, or to prove only gross negligence. To prevail, the plaintiff must meet a higher standard and prove recklessness, as I defined that term for you today.

You should understand that under its Operating Agreement with the MBTA there were things relating to safety at the Attleboro station that Amtrak could do alone. Amtrak was not authorized, however, to alter the intertrack fencing without the approval of the MBTA.

In addition, under Exhibit L of the Operating Agreement, Amtrak did not have a contractual obligation, that is, an obligation under the contract, to put personnel at the Attleboro station. It did, however, have the right to do so unilaterally. And as I have told you, at all times, Amtrak had a duty under the Massachusetts Wrongful Death statute not to be reckless with regard to the safety of people at the Attleboro station like Danielle Beausoleil. With all of the other relevant and credible evidence, you may consider the fact that Amtrak did not have personnel at the Attleboro station on January 3, 1998, in de-

ciding whether it has been proven that Amtrak was reckless.

You should also understand that federal law establishes the permissible speed limit for Amtrak trains. It is not claimed that the train that hit Danielle Beausoleil exceeded that speed limit. In these circumstances, you may not find that Amtrak was reckless, in whole or in part, on the theory that the train was going too fast.