Cindy L. BEAUSOLEIL, Administratrix of the Estate of Danielle Beausoleil, Plaintiff,

v.

MASSACHUSETTS BAY TRANSPORTATION AUTHORITY AND NATIONAL RAILROAD PASSENGER CORP., Defendants.

No. C.A. 98–11503–MLW.

United States District Court, D. Massachusetts.

March 30, 2001.

Francis J. Lynch, III, South Easton, MA, Susan E. Sullivan, Lynch & Lynch, South Easton, MA, for Plaintiff.

Michael McCormack, Amy M. Soisson, McCormack & Epstein, Boston, MA, for Massachusetts Bay Transportation Authority.

Elizabeth Graham, Fitzhugh & Associates, Boston, MA, Thomas P. O'Reilly, Curtin, Murphy & O'Reilly, PC, Boston, PC, Terri–Lynne Neville, Round Rock, TX, Mark S. Landman, Landman, Corsi, Ballaine & Ford, New York City, for National Railroad Passenger Corp.

## MEMORANDUM AND ORDER

WOLF, District Judge.

### I. SUMMARY

Thirteen year-old Danielle Beausoleil was struck by an Amtrak train at the Massachusetts Bay Transportation Authority ("MBTA") rail station at Attleboro, Massachusetts while crossing the tracks on January 3, 1998. Compl. ¶¶ 4, 5, 15. As a result of head injuries she sustained, Danielle Beausoleil died on January 15, 1998. *Id.* ¶ 15. Plaintiff Cindy Beausoleil, administratrix of the estate of Danielle Beausoleil, filed suit against the MBTA and the National Railroad Passenger Corp. ("Amtrak"), asserting claims of negligence resulting in serious bodily injury against MBTA and Amtrak, negligence, gross negligence, and wilful, wanton, and reckless conduct resulting in death against MBTA and Amtrak. Compl. ¶¶ 16–27. Plaintiff seeks compensatory damages, *id.* ¶¶ 16–19, the fair monetary value of decedent including consortium and funeral costs, *id.* ¶¶ 20–23, and punitive damages. *Id.* ¶¶ 24–27.

Summary judgment is being granted in favor of defendants on Counts I and II of the Complaint, with the plaintiff's agreement, because Danielle Beausoleil suffered no conscious pain and suffering from the moment of impact. *See* Apr. 7, 2000 Tr. at 3. Summary judgment is being granted to defendants on plaintiff's negligence claims in the remaining counts because Danielle Beausoleil was trespassing over the tracks at the Attleboro station and, therefore, defendants are only liable if they engaged in wilful, wanton, or reckless conduct that caused her death. Defendants' motions

for summary judgment on plaintiff's claims of wilful, wanton, or reckless conduct are being denied because plaintiff has submitted sufficient evidence that the defendants engaged in reckless conduct to require trial on this issue.

## II. THE SUMMARY JUDGMENT STANDARD

The court's discretion to grant summary judgment is governed by Federal Rule of Civil Procedure 56. Rule 56 provides, in pertinent part, that the court may grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In making this assessment, "the court must look at the record in the light most favorable to the party opposing the motion and must indulge all inferences favorable to that party." *Stepanischen v. Merchants Despatch Transp. Corp.*, 722 F.2d 922, 928 (1st Cir.1983); *Attallah v. United States*, 955 F.2d 776, 779 (1st Cir.1992); *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990).

In determining the merits of a motion for summary judgment, the court is compelled to undertake two inquiries: (1) whether the factual disputes are genuine, and (2) whether any fact genuinely in dispute is material. *Anderson v. Liberty Lobby*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law properly preclude the entry of summary judgment." *Id.* To determine if the dispute about a material fact is "genuine," the court must decide whether "the evidence is such that a reasonable [factfinder] could return a verdict for the non-moving party." *Id.;* *see also Medina–Munoz,* 896 F.2d at 8; *Oliver v. Digital Equipment Corp.,* 846 F.2d 103, 105 (1st Cir.1988).

## III. FACTS

Unless otherwise indicated, the following facts are not in dispute.

On January 3, 1998, Danielle Beausoleil and two friends took MBTA train number 1811 from the Mansfield, Massachusetts station to the Attleboro, Massachusetts station. Compl. ¶ 4. She exited the train on the westbound (or outbound) platform adjacent to track 1. Amtrak Police Report Diagram, Amtrak's L.R. 56.1 Statement of Undisputed Facts in Supp. Of Def.'s Mot. For Summ. J. ("Amtrak Statement of Facts"), Ex. 6; Attleboro Police Diagram, Amtrak Statement of Facts, Ex. 7. Three sets of tracks ran through the Attleboro station: Track 1 ran beside the outbound platform where Danielle exited the train; Track 2 was the middle track; and Track 4 ran adjacent to the inbound platform. *Id.* Danielle intended to meet friends in the parking lot beyond the northbound platform, across the three tracks from the southbound platform where she exited the train. Deposition of Rose Fitzgerald ("Fitzgerald Dep.") at 28.

Intertrack fences ran between tracks 1 and 2, and between tracks 2 and 4. However, the fences did not run continuously throughout the length of both platforms. Instead, they overlapped for thirty-nine feet and, therefore, did not physically preclude passengers from crossing the tracks. By traversing an "S"-shaped path, passengers could walk along one track, around the end of one fence, proceed in the opposite direction, round the second fence, and then pass over a third track. According to the MBTA, the staggered fencing accommodated railroad switching maneuvers and

inspection and maintenance of the tracks by authorized employees. MBTA Answer to Interrogatory No. 24, Amtrak Statement of Facts, Ex. 12. A pipe rail fence separated the three tracks from the inbound platform. Deposition of Paul Meade ("Meade Dep.") at 61–67.

No planking or other material covered the gravel between the rails to suggest an authorized crossing between the tracks. A conspicuous yellow strip with the words "STAND BACK" was located at the edge of the platforms. Photographs of Attleboro Station, Amtrak Statement of Facts, Ex. 8. In addition, signs were posted along the intertrack fences stating: "DANGER: WALKING ACROSS TRACK IS FORBIDDEN," "WARNING—HIGH SPEED TRAINS—STAND BACK," AND "DANGER—HIGH SPEED TRAINS—DO NOT CROSS TRACKS." Attleboro Police Report, Amtrak Statement of Facts Ex. 7; MBTA's Answer to Interrogatory No. 25, *Id.* Ex. 12. Stairs led from the platform levels to a pedestrian underpass providing safe passage from one platform to the other. Photographs of Attleboro Station, Amtrak Statement of Facts, Ex. 8.

Danielle's companion Rose Fitzgerald testified that it was too dark to see the signs along the fences when they arrived at Attleboro station. Fitzgerald Dep. at 42. However, another passenger who got out of the train at the same time as the three girls, and who also traversed the tracks along the same path, testified that he did see warning signs on the fences. Deposition of Michael Maglio ("Maglio Dep.") at 45.

According to Fitzgerald, the three girls looked around for the pedestrian underpass, and because they could not find it, proceeded across the tracks behind all of the other passengers who had just exited the train. Fitzgerald Dep. at 18–19, 26–27. The girls passed over track 1 and walked to the end of the first intertrack fence, but did not immediately go around it and start walking in the opposite direction along track 2 because, Fitzgerald testified, they could not see the gap in the second intertrack fence between tracks 2 and 4. *Id.* Ex. U, at 26. As a result of their initial inability to see the second fence, the girls had to walk east "[q]uite a few yards" more than they would have if they had followed the shortest possible S-shaped route through the tracks.[1] Fitzgerald Dep. at 31; *see also* Amtrak Police Department Diagram, Amtrak Statement of Facts, Ex. 6. Once they could see the opening in the second fence, they headed West along track 2 between the first and second fences to go around the second fence. Fitzgerald Dep. at 30–34.

After walking about half of the remaining length of fence, Fitzgerald noticed the approaching Amtrak intercity train traveling on track 2. Fitzgerald Dep. at 33–34. The girls ran towards the end of the fence but the train hit Danielle, knocking her unconscious. The Amtrak police recorded the time of the accident as 5:38 p.m. Amtrak Police Department Incident Worksheet, Amtrak Statement of Facts, Ex. 6.

Michael Finn, the engineer driving the Amtrak train that killed Danielle, testified that if he saw people on the tracks he "would make noise. If they are not moving out of the way, I would try to reduce

1. In Amtrak's Statement of Facts ¶¶ 14, 16, Amtrak states that Beausoleil and her companions initially walked north along Track 1 and then headed south along track 2. The testimony of witnesses and investigating officers indicates, however, that the girls initially walked east along track 1 and then went west along track 2, where Danielle Beausoleil was struck by the train. *See* Meade Dep. at 143; Amtrak Police Department Supplemental Worksheet, Amtrak Statement of Facts, Ex. 6. This discrepancy is not material.

the speed." Deposition of Michael Finn ("Finn Dep.") at 187. The engineer also testified that he blew the train's horn and activated the emergency brakes within seconds of first seeing the girls on the tracks about 100 feet in front of the train. Finn Dep. at 220. Finn stated that a few seconds before seeing the girls on the tracks he had seen two boys on the platform of the station. *Id.* at 217.

Finn was aware that a commuter train was scheduled to drop passengers off at the Attleboro station shortly before he was to go through it. Fin Dep. at 217; Meade Dep. at 114. Finn also testified that he knew that the passengers who were dropped off at the Attleboro station crossed the tracks "all the time." Finn Dep. at 117. Thus, Finn says, he sounded the train horn some distance east of the station. *Id.* at 114. Finn also said that he applied the emergency brake some time after sounding the horn, upon seeing two passengers on the track. *Id.*

The plaintiff has introduced evidence showing that Amtrak could use train schedules to predict the time at which disembarking passengers were likely to be on the tracks. Beausoleil Statement of Facts, Ex. JJ. Finn could have obtained information over the radio about the time at which the train on which Danielle Beausoleil traveled had left passengers at the station. Finn Dep. at 223. Finn did not believe that it was necessary to do so because he could see people on the tracks. *Id.*

Danielle was unresponsive immediately after she was hit by the train. Fitzgerald Dep. at 38–40; Michael Maglio Dep. at 34, 35, 42; Christine Maglio Dep. at 31; Region V Ambulance Report; Sturdy Memorial Hospital Records; American Medical Response records. She remained unconscious and in a coma until her death twelve

days later, on January 15, 1998. MBTA Statement of Facts ¶ 17.

Danielle's mother Cindy Beausoleil testified that her daughter was aware of the dangers associated with crossing railroad tracks. Deposition of Cindy Beausoleil ("Cindy Beausoleil Dep.") at 25–26. Danielle's father warned her of the dangers of trains and train tracks. Deposition of Bart Beausoleil ("Bart Beausoleil Dep.") at 37–38. In addition, eight months prior to the accident, Danielle attended a presentation at school by the Amtrak police regarding train safety and the hazards of trespassing at commuter rail stations. Cindy Beausoleil Dep. at 26; Meade Dep. at 15–19. At the presentation "Operation Life Saver" that he regularly makes, Officer Paul Meade tells the audience: "they never should cross train tracks. I have this slogan: 'Tracks are for trains; not for people.' I tell them the only safe and lawful place to cross would be at a public grade crossing. I ask them always cross with adults, particularly if I'm speaking to young children." Meade Dep. at 18. Danielle had also read about train accidents in the newspaper, and knew of an individual who was fatally struck by an Amtrak intercity train in 1997, three miles from the Attleboro station. Cindy Beausoleil Dep. at 25–26, 40; Bart Beausoleil Dep. at 54–55; Vincent McNeil Aff. In addition, about fifteen minutes before arriving at the Attleboro station, Danielle used a pedestrian underpass at the Mansfield station to cross from the inbound to the outbound platform. MBTA Statement of Facts ¶¶ 4, 12, 13.

The defendants recognized the danger to pedestrians at the Attleboro station prior to the death of Danielle Beausoleil. On August 12, 1996, William Duggan, the General Manager of the New England Division of Amtrak, wrote to John J. Brennan III, the Director of Railroad Operations of the

MBTA, advising him that passengers were trespassing across the tracks at the Attleboro station. Beausoleil Statement of Facts, Ex. C. Duggan wrote: "[i]t is human nature to take the 'easiest route.' In order to combat this problem, measures should be taken to deter passengers from using this egress route." *Id.* Duggan also warned that "this situation represents a considerable safety issue" and that it was "important to move quickly on this issue." *Id.* Brennan responded on August 22, 1996, asking for a "more detailed plan" and stating: "the situation you describe warrants action and must be addressed with expediency." Beausoleil Statement of Facts, Ex. D.

On November 1, 1996, Duggan sent Brennan a copy of Amtrak's Intertrack Fencing Report, which described a "well-worn path" across the tracks at the Attleboro train station and recommended the extension of the intertrack fencing to a length of 320 feet. Beausoleil Statement of Facts, Ex. F. The estimated cost to extend the fence was $9,958. *Id.* The intertrack fence at the Attleboro station was not extended between November 1, 1996 and January 3, 1998, the date of the accident from which Danielle Beausoleil died. Patrick Moynihan Dep., Plaintiff's Facts, Ex. K, at 50.

On November 24, 1996, passenger David Hill was struck and killed by a train at the Attleboro station. Amtrak Injury Report, Beausoleil Statement of Facts, Ex. H. Defendant MBTA received a letter dated December 26, 1996 from State Representative John Lepper, in which Lepper described the "extremely dangerous" conditions at the Attleboro station and referred to the passenger death at the Attleboro station the month before. Letter from Rep. John Lepper, Beausoleil Statement of Facts, Ex. I. Lepper further noted that during his own daily commute he watched "a long stream of people walk around two short fences, crossing two railroad tracks, to get to their car a few minutes faster." *Id.* MBTA General Manager Patrick Moynihan responded on January 16, 1997, writing that Representative Lepper's "suggestion regarding lengthening fences has been adopted by the MBTA and is being implemented as station rehabilitation work is undertaken." Beausoleil Statement of Facts, Ex. J.

Amtrak and the MBTA shared a duty to maintain the Attleboro Station. *See* 1995 Operating Agreement, Plaintiff's Statement of Facts, Ex. A, p. 8; Ex. D to Operating Agreement, pp. 5, 8, 11. Amtrak asserts that it is undisputed that it was unable to undertake any fencing renovations without the MBTA's approval, and that it cannot, therefore, be liable for any deficiencies in the fencing. Amtrak Statement of Facts ¶ 23. The plaintiff counters that "The Operations Agreement between the MBTA and Amtrak ... does not define "modification" or "renovation", and the addition of signs and intertrack fencing, not a major renovation, is within the authority of Amtrak." Beausoleil Statement of Facts ¶ 38. MBTA Deputy Chief for Railroad Operations John Brennan testified that it was "possible" that Amtrak could have done the renovations on its own and that there would be no retaliation from MBTA if Amtrak modified the fencing without approval. Brennan Dep. at 127, 129. Overall, Brennan's testimony indicates that the proper procedure would have been for Amtrak to receive prior approval from MBTA's engineering staff. *Id.* at 127–130. Amtrak may have a claim against MBTA for unreasonably withholding approval of proposed fencing changes. This does not, however, alter the fact that Amtrak and the MBTA shared responsibility for maintaining the tracks and the station at Attleboro.

## IV. ANALYSIS

### A. Plaintiff's Causes of Action for Negligence

#### 1. Common Law Standard

Plaintiff's negligence claims fail because defendants MBTA and Amtrak owed the decedent Danielle Beausoleil only a duty to refrain from wilful, wanton, and reckless conduct. Summary judgment for defendants is, therefore, being granted on plaintiff's negligence claims.

In order to establish negligence under the common law, the plaintiff bears the burden of proving the existence of a duty owed by defendant to plaintiff, defendant's breach of that duty, actual and proximate causation, and damages. *Bennett v. Eagle Brook Country Store, Inc.,* 408 Mass. 355, 358, 557 N.E.2d 1166 (1990). Whether a defendant owes a duty of care to a plaintiff is a question of law to be decided by the court. *O'Sullivan v. Shaw,* 431 Mass. 201, 203, 726 N.E.2d 951 (2000); *Davis v. Westwood Group,* 420 Mass. 739, 742–43, 652 N.E.2d 567 (1995); *Yakubowicz v. Paramount Pictures Corp.,* 404 Mass. 624, 629, 536 N.E.2d 1067 (1989). "[A]bsent a duty of care there can be no actionable negligence." *Dhimos v. Cormier,* 400 Mass. 504, 507, 509 N.E.2d 1199 (1987).

A possessor of real estate owes a foreseeable trespasser a duty only to refrain from wilful, wanton, or reckless conduct. *Schofield v. Merrill,* 386 Mass. 244, 245–46, 435 N.E.2d 339 (1982). In *Schofield,* the Supreme Judicial Court upheld the traditional rule in Massachusetts "that a trespasser is entitled to no greater duty of care from one with a right of control over land (typically the landowner) than that he refrain from willful, wanton or reckless disregard for the trespasser's safety." *Schofield v. Merrill,* 386 Mass. at 246, 253, 435 N.E.2d 339. The rule confirmed in *Schofield* has two exceptions under which a duty of reasonable care is owed to trespassers. The first is to trespassers who become helplessly trapped and whose presence is known to the landowner. *Pridgen v. Boston Housing Authority,* 364 Mass. 696, 707, 308 N.E.2d 467 (1974). The second is to "certain foreseeable child trespassers." *Schofield,* 386 Mass. at 246 n. 2, 435 N.E.2d 339. As discussed below, however, the exception as to child trespassers is "applicable only where a plaintiff would fail to appreciate his peril because of his youth." *McDonald v. Consolidated Rail Corp.,* 399 Mass. 25, 29, 502 N.E.2d 521 (1987). In addition, the general standard of care imposed by statute and common law as to foreseeable child trespassers is superseded by the railroad exemption contained in M.G.L. c. 229, § 2. Where, as here, Danielle Beausoleil was a trespasser on the tracks at the Attleboro station, the defendants are not liable for negligent conduct.

#### 2. Status as a Trespasser

A trespasser has been defined as "'a person who enters or remains upon land in the possession of another without a privilege to do so, [a privilege] created by the possessor's consent or otherwise.'" *Gage v. Westfield,* 26 Mass.App.Ct. 681, 695 n. 8, 532 N.E.2d 62 (1988)(quoting Restatement (Second) of Torts, § 329 (1965)). Trespass may occur from an intrusion by mistake. *J.D'Amico. Inc. v. Boston,* 345 Mass. 218, 224, n. 6, 186 N.E.2d 716 (1962) (*citing* Restatement of Torts, § 164; Prosser, Torts (2d ed.), § 17). Whether the decedent is a trespasser is a question of law for the court. *Schofield,* 386 Mass. 244, 435 N.E.2d 339.

Under Massachusetts law, it is a crime to be on railroad tracks except at an established crossing. M.G.L. c. 160, § 218.

A person who knowingly and without invitation leaves the platform of a railway station and proceeds along the tracks ceases to be a passenger and becomes a trespasser. *Boden v. Boston Elevated Ry. Co.*, 205 Mass. 504, 507–08, 91 N.E. 879 (1910); *see also Gage*, 26 Mass.App.Ct. at 690, 532 N.E.2d 62 (entry upon railroad tracks outside of established public crossing and without permission constitutes trespass as a matter of law); *Lynch v. Boston & Maine R.R.*, 226 Mass. 522, 526–28, 116 N.E. 248 (1917); *McConville v. Massachusetts Bay Trans. Auth.*, 852 F.Supp. 1, 2 (D.Mass.1994).

■ Massachusetts courts have imposed liability for negligence on railroad companies for injuries sustained while crossing railroad tracks outside of a public crossing only if the railroad took affirmative action which would warrant a reasonable belief that a passenger had a right to cross at that location. *Miller v. Boston and Maine Corp.*, 8 Mass.App.Ct. 770 772, 397 N.E.2d 341 (1979) (holding that minor plaintiff was more than a mere trespasser where defendant railroad laid planking at a crossing and marked it as a crossing at the location and on its maps, and that defendant therefore owed plaintiff a duty to exercise reasonable care). Where railroads have not so induced or implicitly invited passengers to cross outside of a public crossing, defendants have been held immune from liability absent wilful, wanton, or reckless conduct. *Canty v. New York, New Haven & Hartford R.R. Co.*, 337 Mass. 38, 39–40, 147 N.E.2d 801 (1958) (holding that defendant's passive acquiescence to longstanding pedestrian crossing of railroad crossing covered by planking was insufficient to warrant recovery by plaintiff absent wilful, wanton, or reckless conduct by the defendant); *Corrado v. The New York, New Haven & Hartford R.R. Co.*, 333 Mass. 417, 419, 131 N.E.2d 201 (1956) (holding

that bent-down metal link fence separating abandoned station platform from the tracks did not constitute an invitation for the seven-year-old decedent in that case to enter the tracks); *Guertin v. Trustees of New York, N.H. & H.R. Co.*, 322 Mass. 91, 94, 76 N.E.2d 24 (1947) (holding that the railroad's repair of planking crossing the tracks, and the appearance of a "country crossing rather than ... an ordinary railroad crossing" "did no more than allow an inference of permissive use and fell short of invitation."); *McCarthy v. Boston & M.R.R.*, 319 Mass. 470, 66 N.E.2d 561 (1946) (holding that defendant's maintenance of a pass over tracks required by the deed of purchase of the land and the public's frequent use of the crossing constituted mere passive acquiescence and was not an implied invitation for the public to use the crossing, and affirming judgment for defendant where there was no evidence of reckless or wanton conduct).

■ Plaintiff argues that Amtrak's awareness of and acquiescence in the longstanding practice of pedestrians crossing the Attleboro station tracks creates a question to be decided by a jury as to whether Amtrak affirmatively invited Danielle Beausoleil to cross the tracks. Plaintiff asserts that Amtrak's apprehension of potential dangers is comparable to the designation of a crossing on corporate maps and constituted an invitation. The plaintiff's argument derives some support from the fact that it was train passengers rather than the general public who crossed the tracks at the Attleboro station. However, passive acquiescence by the defendant in the use made of a crossing by the public is not equivalent to an inducement or invitation. *Canty*, 337 Mass. at 39–40, 147 N.E.2d 801. Nor is the failure to take active measures to prevent such use be construed as an invitation. *McCarthy*, 319 Mass. at 472, 66 N.E.2d 561; *Sawler v.*

*Boston and Albany R.R. Co.,* 339 Mass. 34, 36, 157 N.E.2d 516 (1959).

In *Miller v. Boston and Maine Corp.,* upon which plaintiff relies, the Massachusetts Appeals Court held that a minor plaintiff was more than a trespasser, stating that "the crossing appeared on B & M's maps, that it was marked with a crossing sign and laid with planks, the frequency of its use (in which the railroad may reasonably be seen to have, at the very least, passively acquiesced), and B & M's knowledge that the adjoining areas were often used *all combine* to warrant the conclusion that the plaintiff was more than a trespasser. Thus, B & M's duty to the plaintiff could have been found to require 'reasonable care in all the circumstances,' and not just the avoidance of reckless behavior." *Miller,* 8 Mass.App.Ct. at 771, 397 N.E.2d 341 (emphasis added). However, the defendants in *Miller* did far more than did defendants in this case to invite members of the public to cross its tracks. Here, the tracks were not marked as a crossing. Rather, fences and warning signs advised the public not to cross the tracks and an underpass provided for safe access between the station platforms. Amtrak's perception of danger was not tantamount to its recognition of the Attleboro tracks as a crossing. *Miller* does not indicate that the defendants here owed Danielle Beausoleil a duty of reasonable care.

Rather, the undisputed facts persuade the court that Danielle Beausoleil was a trespasser when she crossed the tracks at the Attleboro MBTA commuter rail station. She entered property of another without privilege to do so. The defendants did not take actions which would cause a reasonable person to believe that he or she had a right to cross the tracks at the Attleboro MBTA station. On the contrary, intertrack fences prevented direct access between the platforms, a pipe rail fence separated the track bed from the inbound platform, signs warned that crossing the tracks was dangerous and prohibited, and a pedestrian underpass existed for safe transit between the station platforms. No planking or other inducements invited pedestrians to cross the tracks. Therefore, the common law provides that defendants MBTA and Amtrak owed Danielle Beausoleil only a duty to refrain from willful, wanton, or reckless conduct.

### 3. The Wrongful Death Act

Similarly, the Wrongful Death Act, M.G.L. c. 229, § 1, imposed only a duty on the part of the defendants to refrain from wilful, wanton, and reckless conduct with regard to Danielle Beausoleil. The Wrongful Death Act generally creates a right of action for death caused by negligence or as a result of the wilful, wanton or reckless conduct of a person or his agents. M.G.L. c. 229, § 1. However, § 2 of the statute provides that "a person operating a railroad shall not be liable for negligence in causing the death of a person while walking or being on a railroad contrary to law or to the reasonable rules and regulations of the carrier." M.G.L. c. 229, § 2. Accordingly, railroads are only liable if the wilful, wanton, or reckless conduct of their agents causes death if the decedent was a trespasser. *See Corrado,* 333 Mass. at 417–18, 131 N.E.2d 201; *Gage,* 26 Mass. App.Ct. at 691, 532 N.E.2d 62; *McConville,* 852 F.Supp. at 2.

As indicated earlier, under Massachusetts law, it is a crime to be on railroad tracks except at an established crossing. M.G.L. c. 160, § 218. "[V]iolation of G.L. c. 160, § 218, suffices in and of itself to bring the railroad exception of the Wrongful Death Act into play, even where the railroad has reason to anticipate that persons might be on the tracks at a particular

location." *Gage*, 26 Mass.App.Ct. at 690, 532 N.E.2d 62. *See also Corrado*, 333 Mass. 417, 131 N.E.2d 201 (holding that seven-year-old decedent's entry on railroad tracks via a bent-down metal link fence was "contrary to law" under § 2 of the Wrongful Death Act); *McConville*, 852 F.Supp. at 2. ("It is well settled that a violation of a statute that makes it a criminal offense to knowingly stand or walk on a railroad track without right, suffices in and of itself to deny recovery per the railroad section of the Wrongful Death Act, even where the railroad has reason to anticipate that persons might be on the tracks in a particular location.").

■ The MBTA is "a person operating a railroad" within the meaning of M.G.L. c. 229, § 2. The MBTA, a political and corporate subdivision of the Commonwealth of Massachusetts, owns certain lines of railroad which it utilizes for operation of its commuter rail service. *Transport Workers Union of Am. v. Massachusetts Bay Trans. Auth.*, 1999 WL 1203806 (Mass.Super.Nov.15, 1999). In *McConville*, summary judgment was granted for defendants Amtrak and MBTA because the railroad operator exception to the Wrongful Death Act immunized both defendants from negligence liability. *McConville*, 852 F.Supp. at 2. Although it is not clear whether plaintiffs argued that the railroad exception was inapplicable to the MBTA, the court found that the exception applied. *Id.*

Nevertheless, plaintiff argues that the MBTA is not a railroad operator, but instead was simply the owner of the Attleboro train station and, therefore, M.G.L. c. 229, § 2's exemption from liability for negligence does not apply to the MBTA. Pl.'s Opp. to MBTA's Mot. at 5. In *Jad*, the Massachusetts Appeals Court noted that the lower court had held that the MBTA was not the operator of the train and,

therefore, was not exempt from liability under M.G.L. c. 229, § 2. *Jad*, 26 Mass. App.Ct. at 566 n. 3, 530 N.E.2d 197. The MBTA did not appeal that decision, however, so the Massachusetts Appeals Court did not decide the issue. *Id.* Plaintiff cites only *Jad* for the proposition that the MBTA is not a railroad operator, and is not entitled to the railroad operator exception under M.G.L. c. 229, § 2.

The evidence in this case indicates that the MBTA and Amtrak shared a duty to maintain the Attleboro station. *See* 1995 Operating Agreement, Plaintiff's Statement of Facts, Ex. A, p. 8; Ex. D to Operating Agreement, pp. 5, 8, 11. Accordingly, this court concludes that the MBTA is for the purposes of this case "a person operating a railroad" within the meaning of M.G.L. c. 229, § 2, and that the railroad exception to the Wrongful Death Act applies to the MBTA.

■ Amtrak also is a railroad operator and, therefore, benefits from the railroad operator's exception to the Wrongful Death Act. The Rail Passenger Service Act of 1970 ("RPSA"), 84 Stat. 1327, 45 U.S.C. § 501 et seq. (1970 ed.), established the National Railroad Passenger Corporation, a private, for-profit corporation authorized by the Government to operate or contract for the operation of intercity rail passenger service. The statute's declaration of purpose states that Congress created Amtrak to provide a "modern, cost-efficient, and energy-efficient intercity railroad passenger service." 45 U.S.C. § 501(a). The RPSA defines "railroad" as "a person providing railroad transportation for compensation." Amtrak is a railroad and is entitled to the railroad operator's exception.

The conclusion in this case that the MBTA and Amtrak are protected by the railroad operator's exception is consistent with the conclusion reached by other courts. As indicated earlier, in *McCon-*

*ville,* summary judgment was granted for defendants MBTA and Amtrak in a wrongful death action involving a trespasser who committed suicide by placing her head upon the rails before an oncoming train. *McConville,* 852 F.Supp. at 2. In reaching this decision, the court noted that the Wrongful Death Act explicitly prohibits negligence claims against railroads for the death of persons on the tracks contrary to law. *Id.* Because decedent was a trespasser, she was on the tracks contrary to law within the meaning of M.G.L. c. 229. § 2, and judgment entered for the defendants on plaintiff's negligence counts. *Id.*

Similarly, in *Gage,* the Massachusetts Appeals Court affirmed the grant of summary judgment on the negligence counts for defendant Conrail in the wrongful death actions involving decedents who were eighteen and almost sixteen years of age. *Gage,* 26 Mass.App.Ct. at 682, 532 N.E.2d 62. There, Conrail owned a trestle bridge across a river connecting two sets of railroad tracks. The trestle bridge was used as a shortcut between the opposing river banks "[f]or many years" such that "[a] path was beaten into the ground along this route from such use. No barriers prevented pedestrian use of the trestle bridge, and no signs on it or about it warned of any danger.... No planking or other device facilitated travel across the tracks, and there was no public or private crossing nearby." *Id.* at 684, 532 N.E.2d 62. The Massachusetts Appeals Court affirmed the lower court's ruling that the railroad was not liable for negligence under the Wrongful Death Act, and rejected plaintiffs' argument that defendant's acquiescence in the use of the trestle bridge caused the youths to be lawful visitors, not trespassers, and, therefore, the railroad was liable for ordinary negligence. *Id.* at 689, 532 N.E.2d 62. Citing the railroad exception to the Wrongful Death Act, the court stated:

The railroad's liability to the plaintiffs for negligence in this case depends upon whether the two decedents were on the railroad tracks "contrary to law." General Laws c. 160, § 218, as in effect prior to St.1987, c. 501, § 3, provides, "Whoever without right knowingly stands or walks on a railroad track shall forfeit not less than five nor more than fifty dollars." As the statute makes it a criminal offense to stand on railroad tracks, except, presumably, at a recognized public or private crossing, the decedents' presence on the tracks at the time of the accident was "contrary to law." Indeed, violation of G.L. c. 160, § 218, suffices in and of itself to bring the railroad exception of the Wrongful Death Act into play, even where the railroad has reason to anticipate that persons might be on the tracks at a particular location.

*Id.* at 690, 532 N.E.2d 62.

Danielle Beausoleil was, therefore, on the tracks at the Attleboro MBTA station "contrary to law" within the meaning of § 2 of the Wrongful Death Act. The railroad exception applies, and defendants owed the decedent a duty only to refrain from wilful, wanton, or reckless conduct.

The Supreme Judicial Court's decision in *Mullins v. Pine Manor College,* 389 Mass. 47, 449 N.E.2d 331 (1983), does not, as plaintiff contends, qualify this conclusion and demonstrate that the defendants owed Beausoleil a duty of reasonable care in relation to the fencing at the Attleboro station because they voluntarily assumed a duty to fence. Although there is some evidence to provide factual support for this theory, the common law standard of liability applied in *Mullins* is superceded in this case by the railroad exemption of M.G.L. c. 229 § 2.

In *Mullins,* the Supreme Judicial Court held that colleges generally undertake a

duty to protect their resident students from the criminal acts of third parties. *Mullins*, 389 Mass. at 54, 449 N.E.2d 331. The court stated: "We recognize that the mere fact that Pine Manor had voluntarily undertaken to render a service is not sufficient to impose a duty. It must also be shown that either (a) the failure to exercise due care increased the risk of harm, or (b) the harm is suffered because of the student's reliance on the undertaking." *Id.* at 53–54, 449 N.E.2d 331. The court affirmed a jury verdict for plaintiff, concluding that "the jury could have found that students and their parents rely on the willingness of colleges such as Pine Manor to exercise due care to protect them from foreseeable harm." *Id.* at 54, 449 N.E.2d 331. *See also Magaw v. Massachusetts Bay Transportation Authority*, 21 Mass. App.Ct. 129, 485 N.E.2d 695 (Mass.App. 1985); *Davis v. Westwood Group*, 420 Mass. 739, 652 N.E.2d 567 (1995).

In the instant case, there is some evidence that fencing at the Attleboro station increased the risk of harm to Danielle Beausoleil, because the overlapping design of the fences caused her to be unable to get out of the path of the oncoming train in time. *See* Amtrak Police Department Diagram, Amtrak Statement of Facts, Ex. 6. However, the express language of the operator exemption contained in M.G.L. c. 229, § 2 trumps the common law applied in *Mullins* and allows recovery in this case only for wilful, wanton or reckless actions by the defendants.

### 4. The Child Trespasser Statute

Contrary to plaintiff's contention, the Massachusetts Child Trespasser Statute, M.G.L. c. 231, § 85Q, also did not impose a duty of reasonable care on the defendants in this cases even if Danielle Beausoleil was a trespasser. According to that statute:

Any person who maintains an artificial condition upon his own land shall be liable for physical harm to children trespassing thereon if (a) the place where the condition exists is one upon which the land owner knows or has reason to know that children are likely to trespass, (b) the condition is one which the land owner knows or has reason to know and which he realizes or should realize will involve an unreasonable risk of death or serious bodily harm such children, (c) the children because of their youth do not discover the condition or realize the risk involved in intermeddling with it or in coming within the area made dangerous by it, (d) the utility to the land owner of maintaining the condition and the burden of eliminating the danger are slight as compared with the risk to children involved, and (e) the land owner fails to exercise reasonable care to eliminate the danger or otherwise to protect the children.

M.G.L. c. 231 § 85Q.

■ However, just as the railroad exception precludes liability based on the common law negligence principles applied in *Mullins*, it precludes negligence liability based on the Child Trespasser Statute. As the Massachusetts Appeals Court has held, the railroad exception to the Wrongful Death Act applies equally to adult and child trespassers. *See Jad, supra.* In *Jad*, a fourteen-year-old boy was killed by a Boston & Maine commuter train while he walked along tracks owned by the MBTA. The Massachusetts Appeals Court affirmed summary judgment for Boston & Maine under the railroad exception to the Wrongful Death Act. *Id.* at 565, 530 N.E.2d 197. The court assumed without deciding that chapter 231 § 85Q applied to the train owner, Boston & Maine, even though it did not own the land in question. *Id.* at 568, 530 N.E.2d 197. However, the

court relied on the rule that if a general and specific statute conflict the general statute should yield to the specific statute, and held that the Child Trespasser Statute, if applicable, did not supersede the railroad operator's exemption from liability for negligence under M.G.L. c. 229, § 2. *Id.* at 570, 530 N.E.2d 197. The railroad exemption also displaces the common law duty to foreseeable child trespassers enunciated in *Soule v. Massachusetts Electric Company*, 378 Mass. 177, 390 N.E.2d 716 (1979). *Owen v. Meserve*, 381 Mass. 273, 276, 408 N.E.2d 867 (1980) ("we do not think that our decision in the *Soule* case, adopting a more modern view of common law liability to child trespassers, rendered invalid a contrary statutory rule").

 Moreover, even if the Child Trespasser Statute were applicable, Danielle Beausoleil was not owed a duty of reasonable care. Under Massachusetts law, "no duty of reasonable care is owed to foreseeable child trespassers unless they are shown to have been persons who because of their youth do not discover the condition or realize the risk involved." *McDonald v. Consolidated Rail Corp.*, 399 Mass. 25, 29, 502 N.E.2d 521 (1987). In this case, the undisputed evidence compels the conclusion that Danielle Beausoleil generally realized the risk involved in crossing train tracks. As described earlier, Danielle's mother testified that Danielle was aware of the dangers associated with crossing the tracks. Danielle's father had warned Danielle of these dangers. Eight months before the accident, Danielle attended a presentation at school by the Amtrak police regarding train safety and the hazards of trespassing at commuter rail stations. Danielle had also read about train accidents in the newspaper and knew of an individual who in 1997 was fatally stuck by an Amtrak intercity train near the Attleboro station. Moreover, just fifteen minutes before arriving at the Attleboro station, Danielle Beausoleil used a pedestrian underpass at the Mansfield station to cross from the inbound to the outbound platform.

The evidence does indicate that Amtrak Officer Paul Meade had instructed Danielle and her schoolmates to never cross train tracks, to cross only at public grade crossings, and to always cross with adults. While the fact that adults were also crossing the tracks may have influenced Danielle Beausoleil to disregard the risk of crossing, the evidence in the record is not sufficient to permit a jury to reasonably conclude that she failed to realize the risk because of her age, as required by the Child Trespasser Statute.

The instant case is in this respect distinguishable from *Soule*, 378 Mass. 177, 390 N.E.2d 716, on which plaintiff relies. In *Soule*, an eight-year-old boy climbed up to an electric power substation which was located on public, town land and was frequently used by townspeople for hunting and recreation, and was frequented by children. *Id.* at 178–79, 390 N.E.2d 716. Defendants did not fence in the power station, did not post warning signs, and maintained an uninsulated wire carrying 13,800 volts of electricity six to twelve inches above a wooden platform on the station, and the substation failed to meet reasonable safety standards for the industry. *Id.* at 180, 186–87, 390 N.E.2d 716. The plaintiff climbed up to the platform and struck the wire, suffering serious burns. *Id.* at 180, 390 N.E.2d 716. The Supreme Judicial Court reversed the granting of defendant's motion for judgment notwithstanding the verdict and reinstated the jury's verdict for plaintiff. *Id.* at 178, 390 N.E.2d 716. In doing so, the court established a common law duty of reasonable care by a landowner or occupier to prevent harm to foreseeable child

trespassers, because plaintiff had entered the land surrounding the power station "under color of right the right of all the townspeople to recreational use of the town's public land," and because climbing onto electric company installations located on public land is "a special case different from the ordinary trespass." *Id.* at 186, 390 N.E.2d 716.

*Soule* is distinguishable, however, from the instant case. Here, defendants employed fencing to impede crossing over the tracks from the southbound platform, posted several warning signs, and provided a pedestrian underpass to advance passenger safety. The public enjoyed no "color of right" to recreational use of the tracks at the Attleboro station. In essence, no exceptional factors like those involved in *Soule* rendered the decedent's incursion onto the tracks "a special case different from the ordinary trespass." *Id.* Moreover, the common law duty of reasonable care to foreseeable child trespassers enunciated in *Soule* is "applicable only where a plaintiff would fail to appreciate his peril because of his youth." *McDonald*, 399 Mass. at 29, 502 N.E.2d 521. As discussed above, the undisputed facts would not allow a jury to reasonably conclude that Danielle Beausoleil failed to realize the danger of crossing the tracks because of her age.

### B. The Causes of Action for Wilful, Wanton or Reckless Conduct

■ Defendants' motions for summary judgment on the plaintiff's claims of recklessness are being denied, however, because the evidence, when viewed in the light most favorable to the plaintiff, is sufficient to permit a jury to conclude that Danielle Beausoleil's death was caused by the defendants' reckless conduct. As the Supreme Judicial Court has stated, " 'summary judgment is seldom sought or granted in ... actions involving allegedly reckless conduct.' " *Manning v. Nobile*, 411 Mass. 382, 387, 582 N.E.2d 942 (1991) (quoting *Inferrera v. Sudbury*, 31 Mass. App.Ct. 96, 103, 575 N.E.2d 82 (1991)). Summary judgment is, of course, appropriate if there is no evidence from which a jury could reasonably infer that the defendant acted recklessly. *Id.* Such evidence exists, however, in the instant case.

Generally, "wilful, wanton, or reckless" conduct is:

> intentional conduct, by way either of commission or of omission where there is a duty to act, which conduct involves a high degree of likelihood that substantial harm will result to another. Two characteristics of wilful, wanton, or reckless conduct distinguish it from negligence. First, the defendant must knowingly or intentionally disregard an unreasonable risk. Second the risk, viewed prospectively, must entail a high degree of probability that substantial harm would result to the plaintiff.

*Id.* (citations and internal quotations omitted).

"The terms 'wilful,' 'wanton' and 'reckless' are often used interchangeably." *Id.*, n. 8. However, in the instant case, because the evidence does not suggest that the defendants had an actual intention to cause harm to Danielle Beausoleil, the relevant question is not really whether they acted "wilfully." *See Sandler v. Commonwealth*, 419 Mass. 334, 335, 644 N.E.2d 641 (1995). Rather, the issue is whether the evidence is sufficient to prove that defendants' conduct involved "an intentional or unreasonable disregard of a risk that present[ed] a high degree of probability that substantial harm [would] result to another" and was, therefore, "reckless." *Id.* at 336, 644 N.E.2d 641; *Manning*, 411 Mass. at 387–88, 582 N.E.2d 942.

As stated earlier, when viewed in the light most favorable to plaintiff, the evidence is ample for a jury to conclude that in this case the defendants acted recklessly and that their reckless conduct caused Danielle Beausoleil's death. More specifically, the evidence is sufficient to prove the following.

The defendants jointly operated a railroad. This constituted intentional conduct, "by way of commission." *Manning*, 411 Mass. at 387, 582 N.E.2d 942. Under Massachusetts law, defendants had a duty not to operate that railroad recklessly and can be held liable if they failed to satisfy that duty. *See* M.G.L. c. 229, § 2; *Corrado*, 333 Mass. at 417–18, 131 N.E.2d 201; *Gage*, 26 Mass.App.Ct. at 691, 532 N.E.2d 62; *McConville*, 852 F.Supp. at 2. As of the date of Danielle Beausoleil's death, the defendants had long known that many passengers, including children, were crossing the tracks at the Attleboro station after disembarking commuter trains. They also knew that the signs that had been posted were not effectively deterring the crossings and that the fencing that had been erected was not effectively preventing them. Indeed, Amtrak and MBTA representatives had discussed in 1996 that there was a considerable safety issue and a need to deal with it quickly. However, this was not done by the time Danielle was struck and killed seventeen months later.

The defendants also knew that the manner in which they were operating a railroad at the Attleboro station involved a high degree of likelihood of substantial harm to passengers like Danielle Beausoleil. One passenger had been killed in 1996 and a state legislator had, in 1996, emphatically warned the defendants of the grave risk of a recurrence. The MBTA claimed that it was implementing the legislator's proposal that the fencing be improved, but did not do so.

In addition, the engineer of the train that killed Danielle Beausoleil knew that passengers were scheduled to be left at the Attleboro station shortly before he arrived there. He also knew that passengers who were left off at the Attleboro station crossed the tracks "all the time." He could have used his radio to obtain information about the time the train on which Danielle Beausoleil had been traveling let passengers off at the Attleboro station, but did not feel that it was necessary to do so because he thought he could see people on the tracks.

In these circumstances, a jury could properly conclude that the defendants acted recklessly and, as a result, Danielle Beausoleil is dead. As discussed below, cases decided by the courts of the Commonwealth of Massachusetts confirm rather than qualify this conclusion.

For example, in *Inferrera*, the granting of a motion for summary judgment for the defendants, a town and a recreational club, in a wrongful death action involving a trespasser was reversed because the evidence was deemed sufficient to prove recklessness. *Inferrera*, 31 Mass.App.Ct. 96, 102–03, 575 N.E.2d 82. In *Inferrera*, a snowmobiler trespassing on land owned by the town died after hitting a cable strung between two trees. The cable was not marked or flagged, but one of the trees had a "no trespassing sign" which was visible at close range. *Id.* at 98, 575 N.E.2d 82. The decedent and his friends had seen a similar cable at another part of the land. *Id.* The cable was strung by a club that had permission to use the land, but the town had the responsibility of maintaining the cable. *Id.* at 99, 575 N.E.2d 82. The Massachusetts Appeals Court held that the question of whether the defendants were reckless should have been presented to the jury, noting the gravity of the danger posed by the cable

was shown by the injuries to the plaintiff and the defendants knew or should have known that their conduct "created an easily perceptible danger of death or substantial physical harm." *Id.* at 101–02, 575 N.E.2d 82.

The evidence of recklessness in the instant case is stronger than the evidence in *Inferrera.* Thus, granting defendants' motion for summary judgment would also be improper in this case.

Contrary to defendants' contention, it is not appropriate to analyze plaintiff's claim in this case as only presenting discreet duty to warn or duty to fence issues. Rather, it is permissible and appropriate to assess the evidence concerning the totality of the circumstances in deciding whether to grant the motion for summary judgment. *See Manning, supra; Sandler, supra.* In *Manning,* the Supreme Judicial Court found that there was no evidence of wanton, wilful or reckless conduct where a hotel did not provide a bartender for a party of over 100 persons to which it had supplied alcohol when a party guest later injured himself in a drunk driving accident. 411 Mass. at 389, 582 N.E.2d 942. The court did not analyze the case in terms of the "lack of a duty to provide a bartender," but rather held that there was no evidence that "the risk of which Marriott should have been aware involved a 'high degree of probability' that Manning, or any other guest, would injure himself." *Id.* In other words, Marriott's provision of alcohol to the party was sufficient to make that case one of commission rather than omission and, therefore, to require consideration of whether the evidence was adequate to prove recklessness.

Similarly, in *Sandler,* the Supreme Judicial Court reversed a verdict for a plaintiff who had been injured when he fell off his bicycle after striking an uncovered drain in an unlit tunnel on a public bike path. In

order to prevail, the plaintiff had to prove wilful wanton or reckless conduct on the part of the defendant because the case was governed by M.G.L. c. 21, § 17(c), which provides that persons who allow the public to use their land without charge are liable only for wilful, wanton, or reckless conduct. The court in *Sandler* described the case as involving "an alleged breach of a duty to remedy or guard against a known or reasonably knowable dangerous condition." *Id.* at 336, 644 N.E.2d 641. Thus, rather than discussing the case in terms of more specific duties such as a "duty to provide lighting" or a "duty to cover drains," the Supreme Judicial Court implicitly recognized a general duty to act with respect to dangerous conditions under the defendant's control. *Id.*

Moreover, the instant case is factually and legally distinguishable from the duty to fence and duty to warn cases on which defendants rely. The duty to fence cases establish that the statutory obligation to fence imposed by M.G.L. c. 160, § 93 is for the benefit of the owners of adjacent land and for the protection of cattle. The statute does not impose any duty on a railroad to erect and maintain fences along their rights of way in order to prevent injury or death to members of the public who might enter onto their tracks. *See Sawler,* 339 Mass. at 36–37, 157 N.E.2d 516; *Khinoveck v. Boston & M. R. R.,* 210 Mass. 170 at 172, 96 N.E. 52 (1911); *Menut v. Boston & M.R.R.,* 207 Mass. 12, 92 N.E. 1032 (1910); *Byrnes v. Boston & M.R.R.,* 181 Mass. 322, 324, 63 N.E. 897 (1902); *New York Cent. & H. R.R. Co. v. Price,* 159 F. 330, 334 (1st Cir.1908); *Corrado,* 333 Mass. at 419, 131 N.E.2d 201. In contrast to the instant case, these cases did not involve common law claims that fencing was required at a particular railroad station to protect passengers known to cross the tracks regularly at certain times. Nor

did they involve any evidence of recklessness.

The evidence in the instant case would permit a jury to find that the defendants recognized that they had a duty to protect disembarking passengers and erected fences that they came to know were inadequate to serve their intended purposes. This is relevant to several aspects of plaintiff's claim to recover for allegedly reckless conduct.

■ Similarly, the cases cited by the plaintiff regarding the duty to warn do not remove the issue of warnings from this case. Under Massachusetts law, landowners do not generally have a duty to warn persons of average intelligence of open and obvious dangers on their premises because the law presumes that such a visitor would exercise reasonable care for his or her own safety and, therefore, it is not reasonably foreseeable that anyone would suffer injury from blatant hazards. *O'Sullivan*, 431 Mass. at 204, 726 N.E.2d 951; *Drake v. Boston Safe Deposit & Trust Co.*, 307 Mass. 399, 30 N.E.2d 226 (1940); *Polak v. Whitney*, 21 Mass.App.Ct. 349, 353, 487 N.E.2d 213 (1985). Here, however, it is undisputed that the defendants knew that passengers regularly crossed the tracks at the Attleboro station and actually foresaw the dangers posed by such crossings.

Moreover, cases such as *O'Sullivan*, in which the defendants were found not to be liable for failing to warn the plaintiff of the dangers of diving into what the plaintiff knew to be the shallow end of a swimming pool, concern static conditions which were not altered by the defendant once the condition was created. *O'Sullivan*, 431 Mass. at 202–02, 726 N.E.2d 951. *See also Lookner v. New York, New Haven and Hartford Railroad Co.*, 333 Mass. 555, 132 N.E.2d 160 (1956) (holding that landowner not liable for injuries sustained when plaintiff backed into gap in platform of

which plaintiff had been aware); *Tetreault v. Dupuis*, 351 Mass. 710, 222 N.E.2d 876 (1967) (holding that defendant was not liable for injuries sustained when customer saw sweepings on floor and chose to walk over them); *Lyon v. Morphew*, 424 Mass. 828, 678 N.E.2d 1306 (1997). In contrast, the evidence in this case may be construed to show that while Danielle Beausoleil generally was aware of the danger of crossing the railroad tracks, she had no knowledge of the train schedule or of the heightened danger presented by the imminent arrival of the train that killed her.

■ Other cases involving the duty to warn hold that a landowner has no duty to warn of open and obvious dangers on adjacent property. *See Gage*, 26 Mass.App.Ct. at 688, 532 N.E.2d 62; *Polak*, 21 Mass. App.Ct. at 353–54, 487 N.E.2d 213; *Mailloux v. Atiniz*, 1996 WL 1251381 (Mass.Super.1996). The instant case does not involve this issue.

In view of the foregoing, the evidence concerning warnings is part of the proof of the totality of the circumstances which can be considered by a jury in determining whether the defendants recklessly operated the railroad involved in this case. The manner in which the train that killed Danielle Beausoleil was operated may, to a certain extent, also be considered in that assessment.

■ State law causes of action seeking to recover for injuries inflicted by trains allegedly traveling at an excessive speed are preempted by the Federal Railroad Safety Act, 45 U.S.C. § 421, *et seq.*, where, as here, there is no evidence that the train was not operating within the federally prescribed speed limit. *C.S.X. Transportation, Inc. v. Easterwood*, 507 U.S. 658, 675, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993). This does not mean, however, that the speed of the train that killed Danielle

Beausoleil is irrelevant in the context of this case.

In *Easterwood,* the Supreme Court expressly did not decide whether the preemption of plaintiff's excessive speed claim would bar a suit "for breach of related tort law duties, such as the duty to slow or stop a train to avoid a specific individual hazard." *Id.* at 675 n. 15, 113 S.Ct. 1732. Other courts have since held that such claims are not preempted. *See Armstrong v. Atchison, Topeka, & Santa Fe, Railway Company,* 844 F.Supp. 1152, 1153 (W.D.Tex.1994); *Price v. National Railroad Passenger Corporation,* 14 P.3d 702, 707 (Ct.App.Utah 2000); *Missouri Pacific R. Co. v. Lemon,* 861 S.W.2d 501, 510 (Ct.App.Tex.1993). The "reference [to a specific individual hazard] by the Supreme Court in *Easterwood* has been interpreted to refer to a transient condition that could lead to a particular accident." *Price,* 14 P.3d at 707. Thus, in *Lemon,* a claim was held not to be preempted where it was alleged that an engineer improperly failed to reduce his train's speed when his view of a crossing was obstructed by improperly parked tank cars because that was a hazard not taken into account when the Secretary of Transportation established speed limits for trains. *Lemon,* 861 S.W.2d at 510.

■ The instant case is analogous to *Lemon.* The evidence here is sufficient to prove that it was foreseeable that a passenger like Danielle Beausoleil would be crossing the tracks at the time that she was killed. This was a transient condition creating the sort of "specific, individual hazard" identified in *Easterwood.* This court agrees that claims involving such hazards are not preempted by federal law. Thus, the manner in which the train was operated, including the speed at which the train was traveling, is a cognizable consideration in assessing whether the defen-

dants acted recklessly in the totality of circumstances of this case.

This conclusion is consistent with the Massachusetts Appeals Court's decision in *Gage,* which the court recognizes was decided before *Easterwood.* In *Gage,* the court reversed a grant of summary judgment for the defendant railroad company, stating that "[a] finding of recklessness would be warranted, in our view, upon a showing that the operator of the eastbound train was aware of the presence of the two youths in the vicinity of the tracks in time to have stopped." 26 Mass.App.Ct. 681, 692, 532 N.E.2d 62. *Gage* involved trespassers whose presence at a particular time could not have been predicted long before the accident, at a location that had not been acknowledged as dangerous. In the instant case, defendant Amtrak dropped the passengers off at specific times, at a place where they knew the conditions to be dangerous, and where a passenger had been killed two years earlier. The engineer of the train that killed Danielle Beausoleil was aware that passengers were scheduled to be let off another train as he was approaching the Attleboro station and that such passengers often walked across the tracks. Thus, a jury could find that Amtrak had actual or constructive knowledge of the presence of passengers on the tracks and of the danger of the conditions at the Attleboro station, yet persisted in "highly dangerous conduct in the face of a known risk." *Gage,* 26 Mass.App.Ct. at 694, 532 N.E.2d 62. *See also Heller v. Consolidated Rail Corporation,* 576 F.Supp. 6, 10 (E.D.Pa. 1982) (stating that "the crucial point in determining wantonness is whether or not the actor had sufficient warning of the possibility of the victim's peril ... [t]he question in this case is whether there is any evidence to indicate that the railroad

employees had reason to know of the imminent danger which the plaintiff faced.").

Finally, the decision in *Bonney v. Canadian National Railway Company*, 800 F.2d 274 (1st Cir.1986) does not alter the conclusion that defendants' motion for summary judgment must be denied. *Bonney* was governed by the law of Maine, not the law of Massachusetts. *Id.* at 276. The plaintiff was the estate of a person who had died attempting to rescue a trespasser who had fallen off a railroad bridge. Under Maine trespass law a "defendant normally owes no duty of care to a trespasser." *Id.* at 277. The Court of Appeals for the First Circuit found that under Maine law the defendant had no duty to refrain from reckless conduct concerning the deceased trespasser in the context of the *Bonney* case. *Id.*

By contrast, in the instant case a Massachusetts statute establishes that operators of a railroad have a duty to trespassers and are liable for reckless conduct that causes the death of a trespasser. *See* M.G.L. c. 229, § 2; *Owen v. Meserve*, 381 Mass. 273, 275, 408 N.E.2d 867 (1980) ("liability for wilful, wanton, or reckless conduct was added" in 1941, by § 2); *see also, McCreary v. Boston & M. R. Co.*, 153 Mass. 300, 304, 26 N.E. 864 (1891). As described in detail in the Memorandum, the evidence is sufficient to permit a jury to conclude that such reckless conduct occurred and caused Danielle Beausoleil's death.

## V. ORDER

In view of the foregoing, it is hereby ORDERED that:

1. Defendants' Motions for Summary Judgment (Docket Nos. 21, 25) are ALLOWED with regard to Counts I and II, and as to the remaining Counts to the extent that they seek to recover for negligence. Those motions are DENIED to the extent that plaintiff seeks to recover against each defendant for its alleged reckless conduct.

2. A pretrial conference will be held on April 25, 2001, at 4:00 p.m. The parties shall comply with the attached Pretrial Order.

3. Trial shall commence on May 29, 2001.

210

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
 Plaintiff

 CIVIL ACTION
 V.
 NO. _____

_____
 Defendant

## PROCEDURAL ORDER
## RE: FINAL PRETRIAL CONFERENCE/TRIAL

_____ D. J.

The above-entitled action is scheduled for a final pretrial conference on _____

_at _____in _____.

Counsel shall be prepared to commence trial of this action on or after _____. Each

party shall be represented at the pretrial conference by trial counsel.

In order to secure the just, speedy and inexpensive determination of this action in accordance with the Civil

Justice Reform Act of 1990 and Local Rule 16.5, the parties shall meet prior to this conference to accomplish the

following:

(1) to discuss and negotiate settlement of the action;
(2) to draft and sign a stipulation as to all uncontested facts;
(3) to narrow the issues to be tried;
(4) to exhibit to all parties any and all photographs, documents, instruments and other objects any party intends to offer as exhibits at trial;
(5) to give notice to all parties of the names and addresses of witnesses a party intends to call at trial, including the names and qualifications of any expert witnesses.

Counsel shall prepare and file, either jointly or separately, pretrial memoranda and/or trial

documents which set forth the following:

(1) a concise summary of the evidence that will be offered by the plaintiff, defendant and other parties with respect to both liability and damages (including special damages, if any);
(2) a statement of facts established by the pleadings, by admissions or by stipulations. Counsel shall stipulate all facts not in genuine dispute;
(3) contested issues of fact;
(4) any jurisdictional questions;
(5) any question raised by pending motions;
(6) issues of law, including evidentiary questions, together with supporting authority;
(7) any requested amendments to the pleadings;
(8) any additional matters to aid in the disposition of the action;
(9) the probable length of trial and whether jury or nonjury;

[proco.]

(10) a list of the names and addresses of witnesses who will testify at trial and the purpose of the testimony, i.e., whether factual, medical, expert, etc.;

(11) a list of the proposed exhibits (photographs, documents, instruments, and all other objects) in order of their introduction to the Court. Those exhibits to be introduced without objection shall be identified by a single sequence of numbers and those items to which a party reserves the right to object shall be identified by a single sequence of capital letters, regardless of which party is offering the exhibit.

This material shall be filed, in duplicate, no later than five (5) days prior to the scheduled date for the final pretrial conference. A party who intends to object to any proposed exhibit or witness shall give written notice to all parties setting forth the basis for the objection and file said notice, in duplicate, with the clerk on or before _

_____ .

Five (5) days prior to the date assigned for trial each party shall file in duplicate:

(A) In cases to be tried to a jury, a trial brief including:

(1) any proposed questions for the voir dire examination of the jury;
(2) requests for instructions to the jury with citation to supporting authority;
(3) any proposed interrogatories or special verdict form.

(B) In nonjury cases, a trial brief including:

(1) any proposed findings of fact and requested rulings of law.

If the trial materials required by this Order have been previously filed with the Court, please advise the Court in writing of the filing date and supplement trial documents, as necessary. Immediately upon receipt of this Order, any counsel who realizes that one or more attorneys have not been notified shall forthwith notify the additional attorney(s) in writing as to the entry of this Order and file a copy of the writing with the clerk.

Compliance with this Order is not excused, absent the actual filing of closing papers or the entry of a Settlement Order of Dismissal in a form prescribed by the Court.

PLEASE NOTE: The Court requires twenty-four hour notice of settlement. Any settlement on the eve of trial may result in the imposition of costs, including the costs associated with bringing in jurors unnecessarily.

By the Court,

_____ _____
Date Deputy Clerk
 Basil Cronin

Copies To:

(Pretrial.ord - 09/92) [proco.]